Fuld, J.
The Constitution of this State was amended in 1939 to permit such “ pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government ” (art. I, § 9). And, in 1940, the Legislature enacted the Pari-Mutuel Revenue Law authorizing several types of horse racing under State supervision (L. 1940, ch. 254). This statute placed harness racing, which is here involved, under the supervision of the State Harness Racing Commission and, in order to protect the public and to derive “ reasonable revenue for the support of government ’ ’, it provided in section 45 for the following division of the betting pool at each harness track: the holders of winning tickets were to share in 85% of the proceeds, while the operator of the track was to pay the State as a privilege tax about 5% and retain approximately 10% for itself. The tax is declared by the statute to be “ for the privilege of conducting *301 pari-mutuel betting on the races run at the harness horse race meetings By amendments in 1949 and 1954, the measure of the tax, representing the State’s portion of the 15%, was increased and there was introduced a system of graduated tax rates.
In 1956, section 45-a was added to the Pari-Mutuel Bevenue Law (L. 1956, ch. 837), and it is from this amendment that the present controversy stems. The section opens with a legislative finding that “ the state has lost substantial revenues and income ” as a result of the depreciation and inadequacy of the existing physical plant of some of the State’s harness race tracks and that “ enlargement and modernization of plant and structures of such tracks in this state would result in increased admissions and larger sums being deposited in parimutuel pools ”. In order to accomplish the enlargement and modernization desired, section 45-a provided for a reduction in the State’s tax or percentage of the betting pool and placed the difference in a “ construction account ’ ’ from which the tracks would be reimbursed for capital improvements.
More specifically, under section 45-a, the holders of the winning tickets at the tracks were to receive the same percentages of the betting pool as they had before, namely 85%, but the State’s share of the pool was to be reduced by the application of the following formula: the tax was to continue to be calculated at the then existing rates and the State was to receive, from any given track, in any year, an amount equal to that paid by that track in the year 1955. Any tax above this “ base tax ” was then to be divided, half to be paid to the State and the other half to be deposited by the track in its own name in a so-called “ construction account ”. Thus, in effect, 50% of the taxes due the State, above the amount it had collected in 1955, was to be segregated and placed into a construction account.
As to the use of the moneys thus placed in the construction accounts, subdivision 7 of section 45-a provided that any harness track might apply to the Harness Bacing Commission for permission to make capital improvements. And subdivisions 6 (par. [b]) and 10 prescribed that, at the end of each year, a harness track which had completed a capital improvement with the approval of the Commission'could transfer to its own general account the money in its construction account, “ until such date as the amounts paid to such harness race track from the con *302 struction account, less income taxes paid thereon to the United States by such harness race track, equals the cost of the capital improvement ”. And, the statute went on to recite, “ In determining the amount of taxes paid * * * in any calendar year it shall be deemed that said amounts were taxed at the highest rates actually paid to the United States by such harness race track for the particular year involved.”
If, in any given year, the State’s tax revenue from all tracks was less than in 1955, it was provided that each construction account was to be assessed a prorata share to make up the difference. Furthermore, if by the end of a given year no capital improvements had been made, or if the improvements made had already been paid for from its construction account, the balance in such account was to be paid to the State. Finally, it should be noted, actual reimbursement depended upon the consent of the Harness Racing Commission for, by one of its rules, all withdrawals from the construction fund accounts required its countersignature.
This statutory scheme remained intact, in all its essentials, until 1959. In that year, the Legislature, at the behest of the Governor who called a special session for the purpose, amended section 45-a so as to prohibit the approval, by the Harness Racing Commission, of any new capital expenditures thereunder (L. 1959, ch. 881, § 7). Although it made no change in the provisions of section 45-a under which each harness track would be reimbursed from the construction account for the cost of capital improvements already made, the 1959 enactment expressly provided that no harness track “ shall be reimbursed” from the construction account “ for any income taxes paid to the United States ”, whether paid before or after the effective date of the amendment (L. 1959, ch. 881, § 7, amdg. § 45-a, subd. 10; see, also, L. 1959, ch. 881, § 10).
With this review of the statutory background, we turn to the facts of this case. Roosevelt Raceway, Inc., applied for and received approval to make capital improvements under section 45-a and they were completed in 1957 at a cost of $19,605,281. The amount in its construction account for that year was $2,858,495, and that sum was transferred to its general account with the permission and countersignature of the Harness Racing Commission.
*303 Thereafter, Roosevelt notified the Commission that receipt of such sum had resulted in a Federal income tax of $1,404,665, and, accordingly, Roosevelt asked the Commission to note this amount in its records as a “ credit ’ ’ against future construction account funds. The Commission, relying upon an opinion of the Attorney-General, declined to do so and Roosevelt thereupon brought the present proceeding, pursuant to article 78 of the Civil Practice Act, to review the Commission’s decision.
Although the proceeding was instituted before the 1959 amendment to section 45-a, it was not heard or decided until after its effective date. The order sought by Roosevelt was granted at Special Term and was affirmed by a divided Appellate Division (11AD 2d 206). The appeal is in this court as of right.
The courts below were concerned principally with contentions, raised in a companion case which is not before us (Matter of Blaikie, 11 A D 2d 196; and see, for exposition of contrary views, dissenting opinions of Stevens and Valente, JJ., in present case), that section 45-a violates several provisions of the Mew York State Constitution and is void in its entirety. We are pressed to place our decision upon such constitutional grounds and declare the statute “totally unconstitutional”. It is, however, wise and settled policy to hold a statute unconstitutional “ only as a last resort ” (Matter of Ahern v. South Buffalo Ry. Co., 303 N. Y. 545, 555, affd. 344 U. S. 367; see, also, Ashwander v. Valley Auth., 297 U. S. 288, 346, 347, per Brandeis, J., concurring) and, since we have concluded that Roosevelt’s petition must be dismissed even if the serious constitutional questions presented by section 45-a were to be resolved in its favor, we do not now pass upon them.
In granting the relief sought by Roosevelt, the courts below rightly rejected the contention of the Attorney-General that the 1956 statute, properly construed, did not provide for inclusion of the Federal income tax in ascertaining and determining the amount of reimbursement. Payments to a harness track from the construction account are to be made, subdivision 10 of section 45-a provided before its amendment in 1959, ‘ ‘ until such date as the amounts paid to such harness race track * * *, less income taxes paid thereon to the United States by such harness race track, equals the cost of the capital improvement ”. And, in determining the amount of taxes paid, *304 the statute further recited, 1 ‘ it shall be deemed that said amounts were taxed at the highest rates actually paid * * * for the particular year involved There can, therefore, be no doubt that this provision required reimbursement for Federal income taxes paid by the tracks on the amounts received from their respective construction accounts for capital improvements. Even supposing a fanciful construction might be found whereby “ less income taxes ” could be taken to mean “ ignoring income taxes ”, we could not overlook the fact that the Legislature provided that income taxes paid should be determined “ at the highest rates actually paid”. The specification of a method for determining the amount of income taxes precludes the possibility that reimbursement for taxes was not intended.
The formula provided in section 45-a was unquestionably designed to increase the profits of the track—by reducing its State taxes — to the point where the track would retain out of the increased profits, after paying its income taxes on such profits, the total cost of the new facilities. To be sure, under present tax rates this requires payments amounting to approximately twice the cost of any capital improvement and also fails to take into account the tax benefits which the track realizes from depreciation of the new facilities. This consequence, unfair though it might seem, does not, however, warrant disregard of the clear and unequivocal terms of the statute.
Nor may these terms be disregarded, as suggested by the Attorney-General, on the ground that the Legislature in 1959 “ clarified ” the 1956 statute by declaring that section 45-a, as written and enacted in 1956, was not intended to provide for the reimbursement of Federal income taxes (L. 1959, ch. 881, § 10). We have often held that, if the language of a statute is plain and unambiguous, there is neither need nor warrant to look elsewhere for its meaning. (See, e.g., Meltzer v. Koenigsberg, 302 N. Y. 523, 525; Town of Putnam Valley v. Slutzky, 283 N. Y. 334, 343; McCluskey v. Cromwell, 11 N. Y. 593, 601-602.) This principle is, of course, no less compelling because “ the other means of interpretation ” urged is a later so-called clarifying statute. The Legislature has no power to declare, retroactively, that an existing statute shall receive a given construction when such a construction is contrary to that which the statute would ordinarily have received. (See City *305 of New York v. Village of Lawrence, 250 N. Y. 429, 447; People ex rel. Mutual Life Ins. Co. v. Board of Supervisors, 16 N. Y. 424, 431-432.)
As already noted, the Legislature, in addition to ‘ ‘ clarifying ” section 45-a, went on to provide in so many words that “No harness track shall be reimbursed for any income taxes paid to the United States ’ ’ whether paid before or after the effective date of the amendment (L. 1959, ch. 881, §§ 7, 10). This independent and affirmative enactment stands on a different footing from the attempted “clarification” of the earlier (1956) law and calls for separate consideration.
Roosevelt argues that the amendment was not intended to apply to improvements previously authorized and already constructed. And, Roosevelt contends, such a reading of the 1959 statute is supported by reference to its legislative history. Be that as it may, the same principle which forbids “ clarification ” of the 1956 act, since the language of the latter is unambiguous, also forbids resort to legislative history to construe the equally unambiguous language of the 1959 enactment. The statute plainly provides that there shall be no reimbursement of income taxes ‘ ‘ whether paid before or after the effective date of this section.” Since, under the original section 45-a, no reimbursement can take place until after a capital improvement has been completed, the question of reimbursement for income taxes can arise only as to a completed project. Accordingly, the reference made in the 1959 amendment to income taxes paid before the effective date of that amendment can relate only to projects, such as that of Roosevelt Raceway, completed prior to the effective date and not, as Roosevelt claims, to projects to be completed after the amendment became effective.
Any further doubt as to the Legislature’s design as to this issue is entirely dispelled by the other provisions of the 1959 act. These forbid the Harness Racing Commission to issue any further permits for capital improvements or even to certify to the completion of capital improvements previously approved. The 1956 formula for the reimbursement of capital outlays and taxes can only continue to operate with respect to improvements completed and certified before the effective date of the 1959 amendment. This being so, it is clear that the legislative decree that no reimbursement for income taxes shall take place *306 can only have been intended to cover improvements such as those involved in this case, those, that is, which were completed and certified prior to the effective date of the amendment. It is evident, therefore, that the construction urged by Roosevelt would render this provision meaningless.
Moreover, contrary to Roosevelt’s contention, the legislative history (consisting almost entirely of statements attributed to the Governor) is not in conflict with the plain meaning of the statute itself. In discussing the proposed 1959 legislation, the Governor is reported to have said that the change ‘ ‘ will not be unfair” because “the tracks will get what the lawmakers intended them to get ”. This statement merely echoed an earlier opinion by the Attorney-General, and anticipated the later declaration by the Legislature itself, that section 45-a as originally enacted was not intended to provide for income tax reimbursement (N. Y. Legis. Annual, 1959, pp. 381-382).
In short, then, the 1959 amendment to section 45-a was designed to increase the tax imposed upon the tracks by providing, in essence, that reimbursement of expenditures incurred in making capital improvements would continue only until the cost of construction had been repaid and that there would be no reimbursement of, or credit for, Federal taxes.
Roosevelt insists, however, that the State was powerless to do this, that the amendment, insofar as it put an end to the State’s obligation to reimburse for Federal taxes, represents an unconstitutional impairment of a contractual obligation (U. S. Const., art. I, § 10). It is not entirely clear what Roosevelt claims to be the content of the contract which it asserts the State made with it. In resisting the contention that section 45-a violates the constitutional requirements relating to public funds, Roosevelt denied that the State had undertaken to employ its revenues for the construction of harness tracks. This position, sustained by the courts below (Matter of Blaikie, 11 A D 2d 196, supra), was manifestly necessary to overcome the impact of constitutional prohibitions (N. Y. Const., art. VII, § 8; art. VII, § 7; art. V, § 1) and to entitle Roosevelt to any reimbursement whatsoever from the construction account.
But, if we accept this position for the purposes of the present litigation, involving solely reimbursement of Federal income taxes, the only contract which may be said to have been made *307 is a contract for tax relief — a promise by the' State to keep the reduction enacted in the 1956 tax formula intact and unchanged until the track has been made whole, under that formula, out of revenues that would otherwise go to the State as taxes. Such a contract, if not indeed void in its inception—and this is a question as to which ,we express no opinion—is at all times revocable by the State. This was proclaimed and established, beyond the power of the Legislature to alter, by section 1 of article XVI of our present Constitution; in so many words, it declares:
‘‘ The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law.. * * *
" Exemptions from taxation may be granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, education or charitable purposes ”.
Just as the “ reserved power ” to amend corporate charters, found in section 1 of article X of our Constitution, ‘ ‘ prevents the charter from becoming a contract between State and corporation protected from impairment by the [Federal] Constitution ” (Matter of Mount Sinai Hosp., 250 N. Y. 103, 110; see, also, Beloff v. Consolidated Edison Co., 300 N. Y. 11, 19), so section 1 of article XVI of our Constitution ‘ ‘ prevents ’ ’ the 1956 legislative promise to reduce the harness track’s .taxes ‘ ‘ from becoming a contract between State and corporation protected from impairment by the [Federal] Constitution.” (Cf. Troy Union R. R. Co. v. Mealy, 254 U. S. 47, 50, affg. People ex rel. New York Cent. & H. R. R. R. Co. v. Mealey, 224 N. Y. 187.) In other words, in view of the first sentence of section 1 of article XVI, the State may not be said to have breached any contract or agreement with Roosevelt to maintain its State tax at the level provided for in 1956 for the reason that no one was empowered to enter into such an agreement on behalf of the State.
Nor can it be assumed that, in undertaking capital improvements, Roosevelt and the other tracks relied on an assurance that they would receive Federal tax reimbursement which the 1959 Legislature has denied them. Whatever assurance *308 they derived from the 1956 act was necessarily coupled with the knowledge not only that the 1956 Legislature was powerless to bind its successors, but that rates and levels of taxation are the staples of each legislative session. (See Revised Record of Constitutional Convention of 1938, Vol. 2, p. 1127.) Roosevelt and the other tracks must be deemed to have acted in the light of what the law presumes them to have known in this respect. And, since this is so, they can hardly urge that they undertook their capital improvements in consideration of an irrevocable promise or agreement that their taxes would continue to be computed in accordance with the formula set up by the 1956 Legislature and that such taxes would not thereafter be increased. (Cf. People ex rel. Cooper Union v. Gass, 190 N. Y. 323, 327-328, 330.)
Roosevelt attempts to avoid the constitutional mandate of section 1 of article XVT by focusing on its second paragraph — which affirms the Legislature’s power to alter or repeal exemptions from tax—and denying that section 45-a represents a form of tax exemption within its meaning. It asserts that “ It is difficult to see how it can be urged that [section 45-a] granted any tax exemption, when, by its very terms, it could only increase but could not decrease the State’s revenues.” The fact is that section 45-a provided that, in any given year, one half of any taxes due the State above the amount paid in 1955 would only become payable to the State if it were not paid over to the track as reimbursement of capital outlays and Federal taxation paid thereon. Although the tax money involved was only that above the amount collected in 1955, and although freedom from tax liability was made conditional, it is manifest that section 45-a “exempted” from taxation a certain portion of the track’s income. (Cf. Redevelopment Companies Law, L. 1942, ch. 845, particularly § 26, as amd. by L. 1943, ch. 234.)
In the present case, Roosevelt would not be aided even if we were to accept its concept of tax exemption. Section 1 of article XVI separately prohibits any attempt to contract away the power of taxation unless sanctioned by the people themselves. (Cf., e.g., as to Housing, N. Y. Const., art. XVIII, § 2.) A contract for a pre-established limit on tax liability, whether it be considered as conferring “tax exemption” or “tax savings ’ ’, or tax relief by any other label, is clearly barred by *309 this sweeping prohibition. (See Troy Union R. R. Co. v. Mealy, 254 U. S. 47, 50, supra.) The 1959 Legislature was, therefore, free to increase the tax obligations of the harness tracks either by raising the rates of existing taxes or by imposing new taxes. There are limits on, as well as qualifications of, the power to tax, but these have not been disregarded. The asserted limit based on a contract with the State does not exist.
The Raceway places its chief reliance on American Smelting Co. v. Colorado (204 U. S. 103) in support of an argument that section 45-a did not represent a tax exemption. In that case, a foreign corporation was chartered in the State of Colorado under a statute subjecting the foreign corporation so chartered to 11 the liabilities, restrictions and duties which were or might thereafter be imposed upon domestic corporations of like character.” Subsequently, Colorado enacted a statute imposing a higher rate of tax on foreign corporations than on domestic corporations. The Smelting Company refused to pay the higher tax and the State brought a proceeding which resulted in a forfeiture of its corporate charter. On review of the state court’s decision, the United States Supreme Court struck down the tax statute on the ground that it ‘ ‘ impaired the obligation of the contract existing between the corporation and the State ’ ’ (204 U. S., at p. 115). In reaching this conclusion, the court met the argument that the Constitution of Colorado had a provision prohibiting the Legislature from making any contract of tax exemption by stating that ‘ ‘ This is not an exemption from taxation, it is simply a limitation of the power to tax beyond the rate of taxation imposed npon a domestic corporation” (204 U. S., at p. 114).
We need not now consider whether this 1907 decision by a closely divided court represents current constitutional doctrine for, in any event, its bearing on the present case is remote. The statute in the Smelting Go. case was nothing more than an act authorizing the chartering of foreign corporations. It was not directed at effecting a change in the Smelting Company’s tax status, in giving it a certain tax advantage, but rather at providing that it should be treated, in all respects, like any other corporation. Here, however, the statute which the Raceway relies on was enacted for no other purpose than to stimulate the building of tracks by providing tax advantages. Section *310 45-a, unlike the statute involved in the American Smelting Co. case, is a tax statute, designed for the very purpose of relieving or reducing a tax burden, and, as such, it falls within the very purview of the limitations of section 1 of article XVI of the Constitution.
One further point remains to be considered. It is suggested that, despite the general validity of the 1959 amendment, it offends constitutional requirements to deny reimbursement to Roosevelt for the Federal income taxes which it paid before the 1959 statute was enacted. As the State tax in question is a privilege tax (supra, pp. 300-301), a retroactive change affecting Roosevelt’s tax liability for years prior to 1959 might well be invalid. However, when considered in its context, the 1959 enactment will be seen to be entirely prospective in its operation.
A retroactive tax is one which is imposed on past transactions or for past periods. If the 1959 change in Roosevelt’s tax liability were retroactive, it would require Roosevelt to return to the State money which it has already withdrawn from the construction account. The statute will not have such an effect. It will not require Roosevelt to pay in taxes for the years 1957 and 1958 a penny more than it has already paid under section 45-a before its amendment. Under the 1959 statute — the constitutionality of the 1956 act aside—all the moneys in its construction account for those years, which it has already received, it may retain.
Roosevelt has spent over $19,000,000 on capital improvements, and its construction account accumulates (at the 1957 rate) roughly $3,000,000 annually. The only difference which results from giving full effect to the 1959 amendment is that, when, as a result of its annual withdrawals from the construction account, Roosevelt has received the entire amount which it spent for capital improvements — say, by 1965 — its taxes thereafter will no longer be subject to reduction. This is a purely prospective change in the measure of the tax; to be sure, Roosevelt’s tax for 1966 will then be higher than it would otherwise have been, but this is an exercise of the very power to alter and increase taxes which section 1 of article XVI has inviolably preserved.
The result might, perhaps, have been seen more clearly if the Legislature had said that there shall be no future reimbursement for any sum in excess of the amounts actually *311 expended for capital improvements. This is what the Legislature did say, although in somewhat different words. Since the Legislature was free to make any prospective change in the measure of the tax imposed (N. Y. Const., art. XVI, § 1), it was free in 1959 to restore the 1954 tax rates in their entirety and ban any further reimbursement whether attributed to the payment of the Federal income taxes or the cost of the capital improvements themselves. This being so, we are unable to see any infirmity in the 1959 amendment that reimbursement shall cease when the full cost of the capital improvements shall have been repaid.
Since section 45-a, as originally enacted, was — quite apart from its constitutionality, which we are not considering on this appeal—subject to the power of the Legislature to alter or repeal it, and since the Legislature did validly alter it by its 1959 enactment, Roosevelt’s rights must be determined in the light of its provisions. In view of the explicit declaration of the 1959 statute that no harness track may be reimbursed from the construction account for any income taxes paid to the United States, ‘ ‘ whether paid before or after the effective date of this section ”, Roosevelt is not entitled to reimbursement for Federal taxes and its petition to compel the Commission to record a credit for such taxes must be dismissed.
The order of the Appellate Division should be reversed and the petition dismissed.