OPINION OF THE COURT
Gabrielli, J.
At issue in this appeal is whether Federal funds which are received by the State and placed in a joint custody account within the State treasury must be appropriated by the Legislature before they may be disbursed by the Executive Department. The appeal requires us to interpret and apply section 7 of article VII of the State Constitution, which provides that “[n]o money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law”. Relying upon past practices of the Executive Department and the Legislature, the Appellate Division concluded that the Federal funds in issue are not subject to this constitutional proscription. We now reverse and hold that because the money in question falls within both the literal language and the underlying purpose of the constitutional provision, it cannot be spent without legislative approval in the form of a duly enacted appropriation bill.
Over the past several decades, revenues derived from the Federal Government have played an increasingly important role in State governance. While the notion of Federal assistance to the States was all but unheard of in the mid-nineteenth century when the constitutional provision in issue was first adopted,[1] such assistance now comprises approximately one third of the total budget for New York *359 State.[2] Indeed, the Federal Government now provides substantial subsidies for such traditional and diverse State activities as law enforcement, aid to the needy, housing, education and maintenance of public highways. The vast majority of Federal funding programs are subject to various “matching” formulae, and there are strict regulatory systems which circumscribe the manner in which some of the Federal funds may be spent. Nevertheless, it is undisputed that the State retains a measure of discretion in determining where and how some of the Federal moneys should be spent.
Yet, despite the significance of Federal assistance in the over-all State budget, there has heretofore been little or no legislative participation in the expenditure of Federal moneys. Instead, it has been the practice of the executive branch to place the Federal funds received in the State treasury for “administrative convenience”[3] and from there to disburse them directly to the various responsible State agencies.[4] It is this practice which plaintiffs are challenging in the instant action for declaratory relief.[5]
Initially, we note that the wording of the constitutional provision governing the expenditure of State funds is clear and uncomplicated. Section 7 of article VII of the State Constitution, quite simply, requires that there be a specific legislative appropriation each time that moneys in the State treasury are spent. The constitutional provision does not differentiate among funds on the basis of their source, and there is thus no logical justification for excluding Federal funds from its ambit on the theory that they are derived *360 from Federal taxation programs and are given to the States to promote national goals. So long as the funds are placed within the State treasury, the clear language of the Constitution prevents their removal without legislative authorization.
Contrary to defendants’ contentions, our ruling in Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund (22 NY2d 119) does not suggest an alternative conclusion. To be sure, we noted in that case that “not every fund made up of public moneys raised through taxation or otherwise comes within the purview of section 7 of article VII” (22 NY2d, at p 123). Our holding in Saratoga, however, was clearly predicated upon the fact that the money in issue there, although raised through legislative assessment, never fiecame the property of the State and was never placed within the State treasury, but rather was immediately deposited in a separate fund administered by a legislatively created public benefit corporation. The issue with which we were concerned in Saratoga was thus limited to the narrow question whether a fund jftoi covered by the literal wording of section 7 of article VII should nevertheless be considered subject to its mandate in light of the underlying purposes of that constitutional provision (id., at pp 123-124; see, also, Metropolitan Transp. Auth. v County of Nassau, 28 NY2d 385; Matter of Clark v Sheldon, 106 NY 104; cf. People ex rel. Evans v Chapin, 101 NY 682). The ruling in Saratoga is obviously inapplicable in a situation such as this where the moneys in issue are included in the State treasury and are therefore unquestionably within the precise language of the constitutional proscription.
Similarly unpersuasive are defendants’ efforts to compare their present practices with respect to Federal moneys to the legislative practice of creating “off budget” funds by expressly providing that certain revenues shall not be placed within the State treasury nor deemed to be the funds of the State (e.g., Agriculture and Markets Law, § 294, subd [8] ; State Finance Law, § 121). Since the constitutional appropriation requirement is, by its terms, addressed only to funds in the State treasury or “funds under its manage *361 ment”, this simple expedient has heretofore enabled the Legislature to avoid the necessity of enacting a specific appropriation bill each time moneys in an “off budget” fund are expended.
While serious questions may be raised concerning the propriety of this practice in light of the purposes underlying section 7 of article VII (see 1939 Opns Atty Gen 145; but cf. Wickham v Trapani, 26 AD2d 216), we need not consider such questions in this context, since the Federal moneys at issue here have never been expressly designated by the Legislature as “off budget” funds. Although the Legislature has on occasion indirectly recognized the practice of the executive branch of spending Federal funds without legislative appropriation (see, e.g., State Finance Law, § 22, subd d), it has not unambiguously indorsed the practice by authorizing the State’s fiscal officers to segregate Federal moneys from the general treasury fund. The absence of such an authorization is particularly significant in light of the provisions of section 121 of the State Finance Law, which contain a complete and detailed list of the types of funds that may be withheld from the treasury-(cf. State Finance Law, § 11). Indeed, inasmuch as the Federal funds in issue have not been clearly designated by the Legislature as “off budget” funds and have, in fact, been deposited in the State treasury by the Comptroller, there can be no doubt that they are now within the literal mandate of the Constitution and any effort by defendants to analogize the present problem to that created by “off budget” funds can only be regarded as unavailing.[6]
Despite the relative simplicity and clarity of the constitutional provision requiring appropriation of all treasury funds, it has been suggested in this case that the plain meaning of the provision should be ignored and that the contrary *362 “practical construction” placed upon the clause by the Legislature should instead be adopted (see Matter of Kolb v Holling, 285 NY 104,112; People ex rel. Einsfeld v Murray, 149 NY 367). We find this suggestion to be unpersuasive, however, since there is really no justification in this instance for departing from the literal language of the constitutional provision. It has never been the law in this State that the clear and unambiguous wording of a statute or constitutional provision may be overlooked entirely when it is seemingly inconsistent with the practice and usage of those charged with implementing the laws (see, e.g., Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1). To be sure, there have been instances in which we looked beyond the wording of a statute or constitutional provision when its applicability to a particular problem was uncertain (Matter of Kolb v Holling, supra) or when wooden application of the literal language would lead to an absurd conclusion (see New York State Bankers Assn. v Albright, 38 NY2d 430, 436-437). Where no such difficulty is present, however, “[t]he most compelling criterion in the interpretation of an instrument is, of course, the language itself” (People v Carroll, 3 NY2d 686, 689).[7] As we noted in Matter of Wendell v Lanin (246 NY 115, 120), “[sjometimes the interpretation of a doubtful and obscure clause in an act of the Legislature, or in a Constitution, may be aided by the practice which has grown up under it, but plain and clear provisions of a Constitution require no such aid; they are to be enforced and brought to life early or late, and must not *363 be smothered by the accumulations of customs or violations”.
Additionally, it must be stressed that the legislative view of the applicability of the constitutional appropriation requirement to funds derived from the Federal Government has not always been completely consistent. On the one hand, there are enactments such as subdivision d of section 22 and sections 53 and 53-a of the State Finance Law, which indicate that the Legislature assumed, at least at one time, that the Constitution does not mandate appropriation of Federal funds (see, also, Report of the Temporary Commission on the Constitutional Convention, 1967, Report No. 8, State Finance, at p 135).[8] On the other hand, efforts by some as early as 1938 to amend the predecessor to article VI so that Federal funds would expressly be excluded from the treasury are indicative of a contrary understanding on the part of lawmakers (see New York State Constitutional Convention, 1938, Proposed Amendments, vol I, No. 271, Int 260). And, in a similar vein, a report of the Assembly Ways and Means Committee issued in 1976 demonstrates the belief of at least some of the members of the Legislature that the “broad power [to appropriate funds pursuant to section 7 of article VII] clearly could be interpreted to already include federal funds, even without further legislation” (Report of the Assembly Ways and Means Committee, Appropriating Federal Funds: A Proposal for New York State, Dec. 6, 1976, at p 14). In short, while long-standing legislative practice may be instructive in some contexts, the absence of consistency in the legislative approach to the problem presented here renders it particularly unsuitable for use as an analytical tool in this case.
On the other hand, an analysis of the intent of the framers of the Constitution in adopting the predecessor of section 7 of article VII does serve to shed light upon the proper application of the provision. Initially adopted in 1846 as part of the Third Constitution, the appropriations rule was part of an effort by the framers to stabilize the financial management of the State and to superimpose a *364 measure of legislative control over the then unbridled power of the executive branch to spend. The problem to which the provision was addressed was described as follows: “Before 1846, there were apparently few checks on expenditures by administrative officers of the State. At any rate the Legislature was not in a position to check borrowing or spending by these officials. As long as the treasury held funds, the administrative officers would be paid and could pay since the power and duty to pay demands against the State treasury were vested in these officers. If the treasury lacked funds, the State Comptroller could have simply gone into the market to borrow on the credit of the State and replenish the treasury” (Report of the New York State Constitutional Convention Committee, 1938, Problems Relating to Legislative Organization and Powers, vol VII, at pp 97-98). The prohibition against the expenditure of funds in the treasury without specific legislative appropriation, coupled with the provision limiting the effectiveness of each appropriation to a two-year period (NY Const, art VII, § 7) would, it was hoped, “compel every new Legislature to see what money went for this, and what for that object, and the people, by reading the statutes, could then get some idea of how the money went, where it went, and how much was paid annually to carry on the government” (Remarks of Mr. Hoffman, Constitutional Convention of 1846, Proceedings and Debates, at p 941 [emphasis in original]; see 2 Lincoln, Constitutional History of New York, at pp 183-184).
Although the framers of the Constitution obviously could not have anticipated the massive role that Federal funds were to play in the composition of future treasuries, the concerns they expressed at the time that the appropriation rule was adopted remain of equal concern today. First, even though there are significant limitations upon the manner in which Federal funds may be spent, there is still a danger that the executive branch, if unchecked by the Legislature, could overspend in anticipation of Federal revenues and would thereby commit the State to obligations which will ultimately have to be met by the State’s taxpayers. This possibility alone would seem sufficient ground *365 for requiring legislative participation in the spending process.[9]
Even more important, however,- is the need to ensure a measure of accountability in government. As the framers of the Constitution astutely observed, oversight by the people’s representatives of the cost of government is an essential component of any democratic system. Under the present system, some one third of the State’s income is spent by the executive branch outside of the normal legislative channels. The absence of accountability in this sector of government is, manifestly, an unacceptable state of affairs in light of the framers’ intention that all of the expenditures of government be subjected to legislative scrutiny.[10]
Finally, we note that application of the strictures imposed by section 7 of article VII to Federal funds is necessary to the maintenance of the delicate balance of powers that exists between the legislative and executive branches of government (see NY Const, art III, § 1; art IV, § 1). In our *366 system, the right to establish and implement the policies of the State through the use of the spending power is shared by the executive and legislative branches, each of which has a distinct, constitutionally defined role to play in the budget-making process (see Matter of County of Oneida v Berle, 49 NY2d 515, 522-523). The right of the executive branch to participate in the process is ensured by section 7 of article IV and sections 2 and 4 of article VII, which authorize the Governor to submit a proposed budget to the Legislature and to veto specific appropriation measures on a line-by-line basis. The right of the Legislature to participate is, in turn, ensured by its general law-making power (NY Const, art III, § 1; see, e.g., People ex rel. Simon v Bradley, 207 NY 592) and by its power to pass upon all expenditures from the treasury in accordance with section 7 of article VII. When the appropriation rule is bypassed, as it presently is in the case of Federal funds, the Legislature is effectively deprived of its right to participate in the spending decisions of the State, and the balance of power is tipped irretrievably in favor of the executive branch.
It could, of course, be argued that the need for legislative participation at the State level is minimal where Federal funds are concerned, since the manner in which such funds may be spent is, in any event, heavily circumscribed by Federal regulations. Moreover, since the Legislature retains the right to determine whether and to what extent the State should partake of existing Federal aid programs in the first instance (see, e.g., Public Health Law, § 701, subd [a] ; Labor Law, § 21-c; Education Law, §§ 270, 377, subd 2; §§ 3713, 5713, subd 4; Social Services Law, § 20, subd 2, par [c]; §§ 29, 358, subd 2; § 363-a, subd 4), it might further be argued that the need for the Legislature to participate is, as a practical matter, exhausted well before the moneys in question are actually spent. Both of these arguments, however, are seriously flawed.
While there are severe limitations upon the manner in which Federal funds may be spent none of the Federal funding programs is self-executing. Indeed, it is undisputed that the States retain a measure of discretion in applying *367 most of these funds to specific local needs. To the extent that such discretion exists, of course, the elected representatives of the people should be permitted to play a substantial role in the allocation of Federal assistance funds through the appropriation process.[11] Of even greater significance, however, is the overriding need to vindicate the fundamental principle embodied in section 7 of article VII — i.e., that control of the pursestrings of the State treasury resides in the Legislature. As we noted in People ex rel. Burby v Howland (155 NY 270, 282): “The object of a written Constitution is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers. The safety of free government rests upon the independence of each branch and the even balance of power between the three. * * * It is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men”.
We have no doubt that the past and present practice of disbursing Federal funds without the explicit approval of the Legislature represents a well-intended effort by the executive branch to facilitate the efficient use of existing *368 Federal aid programs and is, in no way, indicative of an attempt on the part of the executive to usurp the powers of the Legislature. Nonetheless, because we are convinced that the practice violates both the letter and the spirit of section 7 of article VII of the State Constitution, we are duty bound to hold against defendants in this case.[12]
Accordingly, the order of the Appellate Division should be reversed, without costs, and a judgment granted in favor of plaintiffs declaring that the expenditure and payment of moneys received from the Federal Government and retained in the joint custody funds of the State treasury without an appropriation violate section 7 of article VII of the New York State Constitution.

. The constitutional provision in question was originally adopted as section 8 of article VII of the Constitution of 1846. It was incorporated without change as section 21 of article III of the Constitution of 1894 and has remained a part of the constitutional law of this State to the present day.

. This State received some $6.6 billion in Federal funds during the fiscal year 1980-1981. The figure is expected to climb to some $7.2 billion out of total State expenditures of $23.8 billion for the fiscal year 1981-1982.

. The funds in question are presently deposited in “joint custody funds”, which are held within the treasury and are under the dual control of the Comptroller and the Commissioner of Taxation and Finance.

. In most instances, the funds are disbursed directly upon warrant of the Comptroller.

. Plaintiffs moved for summary judgment below, and, as a consequence, the case is before us in summary judgment posture. It should be noted that plaintiffs have not requested injunctive relief, since they assume that defendants, as public servants, will adhere to the mandate of this court as embodied in our declaration.

. Contrary to the assumption of the dissenters, we do not mean to suggest that the accounting practices of the Comptroller are dispositive on the question of what funds must be placed in the treasury and appropriated pursuant to section 7 of article VII. That question, of course, can only he resolved after an analysis of the history and purposes of the constitutional provision. At this point, however, it should be sufficient to note that we are not here faced with the problem of determining whether a particular decision by the Comptroller to withhold funds from the treasury without legislative sanction could be reconciled with the requirements of the Constitution, since the Comptroller has in fact made no such decision with respect to the Federal funds in issue.

. It should be noted that in most instances where legislative practices have been used to shed light upon the meaning of a constitutional provision, the courts have looked to the prevailing practice at the time the particular provision in issue was adopted. The rationale for using contemporaneous legislative practice as an analytical tool has been stated as follows: “It is not unlikely that the Legislature was composed of some of the same persons who composed the constitutional convention. At all events the discussions in and out of the convention were then fresh, and the Legislature would naturally be governed by considerations similar to those which actuated members of the convention” (People ex rel. Joyce v Brundage, 78 NY 403, 406; see Matter of Kolb v Holling, 285 NY 104, 112; People ex rel. Williams v Dayton, 55 NY 367, 378). Such a rationale is of limited utility in this case, however, since the problems posed by massive Federal assistance to the States could not have been contemplated by those who were present at the framing of the 1846 Constitution, in which the predecessor of section 7 of article VII first appeared.

. (See, also, Social Services Law, §20, subd 2, par [c]; Mental Hygiene Law, § 45.07, subd [h]; Executive Law, §§ 539, 837, subd 9; Highway Law, § 80, subd 3.)

. The dissenters suggest that legislative appropriation of Federal funds would not diminish the danger of overspending by the executive branch, since an executive who is willing to disregard Federal spending guidelines “could just as easily disregard or unintentionally misapply directives of the Legislature” (p 373). This suggestion, however, simply proves too much. Executive overspending is far less likely to result from willful disregard for Federal law than from simple miscalulation or misunderstanding of what the Federal rules and regulations require (see, e.g., State of New York v Harris, Civ No. 80-1265, July 11, 1980, US Dist Ct of DC [Pratt, J.]). Since .there is no necessary connection between overspending and executive lawlessness, it cannot be assumed that an executive who would exceed Federal spending guidelines would also be willing to consciously defy State law by spending more Federal dollars than the Legislature has appropriated. And, while Federal rules and regulations may leave room for misinterpretation and consequent overspending of Federal aid by the executive branch, it is highly unlikely that an executive will “unintentionally” overspend a legislative appropriation because he misunderstands the simple budgetary limitations that have been imposed upon his spending authority.

. It has been argued that statutes such as subdivision d of section 22 and sections 53 and 53-a of the State Finance Law, which require the executive branch to report proposed expenditures of Federal moneys to the Legislature, are sufficient to ensure the necessary degree of accountability. Reporting requirements established by statute, however, cannot serve as substitutes for the constitutionally mandated requirement of direct legislative oversight through lawful appropriations. While present lawmakers may feel that such reporting requirements are adequate, they obviously have no power to override the method that was chosen by the framers of the Constitution to ensure governmental accountability.

. The dissenters apparently would limit application of the appropriation rule to Federal funds that are not encumbered by “general terms and conditions” (p 380). Because of the complexity of the regulations governing the various Federal aid programs, however, the distinction proposed by the dissenters is simply too vague and ill-defined to support a meaningful constitutional rule. The central difficulty with the dissenters’ analysis is its failure to recognize that Federal funding programs cannot readily be classified as either strictly circumscribed by rules and regulations or not encumbered at all. Apart from those programs involving direct financial assistance to the needy under which the State acts as a virtual conduit for Federal moneys, most of the Federal funding plans leave to the States a measure of discretion in allocating the funds while imposing some “general terms and conditions”, including the purposes for which the funds may be spent. Although the dissenters’ rationale suggests that at least some of these funds must be appropriated, since disbursement of such funds necessarily entails the making of certain policy choices, they have not articulated a rational method for distinguishing among the numerous Federal funding programs, which contain varying degrees and types of constraints. Thus, the dissenters’ approach itself gives rise to a number of ambiguities, and consequently it cannot serve as an adequate tool for resolving the problem presently before the court.

. Wheeler v Barrera (417 US 402), cited by the dissent, is not persuasive. It holds only that if the Federal Government prescribes the objects and uses to which Federal funds made available to a State are to be applied, the accepting State may not, in response to the dictates of its Constitution or statute, divert the funds from such objects and uses. There is no basis, however, for assuming that our Legislature, having once elected to authorize State participation in a Federal program, would use its appropriation authority to violate Federal law or divert Federal funds from their intended purpose. And, since the mere application of the appropriation requirement to Federal funds received by the State is not inherently at odds with any of the existing Federal mandates, the dissenters’ invocation of the supremacy clause and concerns about the potential for conflict between the State and Federal governments may only be regarded, at best, as premature.