OPINION OF THE COURT
Thomas W. Keegan, J.
Plaintiffs, a citizen taxpayer and three not-for-profit corporations, commenced this taxpayer action pursuant to State Finance Law article 7-A seeking to declare that the defendant State Department of Transportation’s (DOT) method of repaying the Federal Highway Administration (FHWA [not a named party]) approximately $80 million for the Federal share it contributed to the since-cancelled Westway interstate highway project constituted an expenditure of State funds in the absence of legislative appropriation in violation of State Finance Law § 4 (1) and NY Constitution, article VII, § 7; and violated the exclusive payment mechanism established by the Legislature for the payback (see, Public Authorities Law § 379 [1] [a]; L 1995, ch 54 [Capital Projects Budget for 1995-1996]). Plaintiffs also seek injunctive relief essentially directing DOT to recover the repayment. The State defendants have moved for summary judgment. Plaintiffs cross-move for partial summary judgment on their claims for declaratory relief.
*559 BACKGROUND
The Westway project was a proposal approved by the FHWA to build an interstate highway[1] along the lower west side of midtown Manhattan. In 1981-1982,-the State acquired from New York City for $90 million the right-of-way to property on which the highway was to be built (R.O.W.). The project, as part of the interstate highway system, was to be funded with 90% Federal reimbursement, and in accordance therewith, the FHWA reimbursed the State for over $80 million for the "Federal share” of the cost of acquiring the property. The State ultimately determined not to construct Westway and, on September 30, 1995, requested that FHWA approve the withdrawal of the project from the interstate system, which FHWA approved. Under Federal law, the State had 10 years — or until September 30, 1995 — to refund to the FHWA Trust Fund the Federal share of the acquisition cost for the Westway property R.O.W. (see, 23 CFR 480.109 [b] [1] [refund of 90% of current fair market value of property required]). Alternately, the State’s obligation to repay could be reduced if some or all of the property were used for another FHWA-approved, permissible transportation project (see, 23 USC § 103 [e] [7]).
To ameliorate the State’s refund obligation, Congress included an amendment in section 143 of the Federal-Aid Highway Act of 1987 (Pub L 100-17, 101 US Stat 178), which modified the State’s refund obligation in two respects: (1) the State was only required to refund the amount actually provided in 1981 by the Federal Government, approximately $80 million, rather than 90% of the then-current FMV of the property; and (2) after receipt of the $80 million repayment, the Federal Government would give the State an additional $80 million in transportation spending authorization for expenditure on FHWA-approved highway projects. The amendment is referred to as the "Moynihan Amendment” after our United States Senator. In 1990, the Commissioner of DOT submitted a proposal to have the Westway property used for an alternative Federally permissible transportation use — and one consistent with State zoning laws — in an effort to obtain a reduction or waiver of part of the State’s refund obligation under 23 USC § 103 (e) (7), which the FHWA rejected in part on the grounds that the proposal was inconsistent with Federal law.
FHWA notified DOT in February of 1995 of its obligation to refund the $80 million by September 30, 1995, or obtain a *560 waiver under 23 USC § 103 (e) (7). FHWA indicated that, if timely payment were made, no interest would be charged and the State would receive the benefits of the Moynihan Amendment, i.e., the State’s fiscal year (FY) 1996 "obligation authority”[2] or Federal highway apportionment would be increased by the $80 million amount the State will have refunded to the FHWA Trust Fund. FHWA stated that, if payment were not timely received, it would proceed to deduct the full amount due from the State’s current billing credits, i.e., money due the State from the Federal Government for the Federal share of money the State has already spent on FHWA-approved highway projects. FHWA offered to allow the State the option of making the repayment using the billing credits due the State.
By letter of July 26, 1995, DOT communicated to FHWA its intent to repay the Federal Government in installments, using billing credits, i.e., by waiving or releasing the amounts due the State. Using this mechanism, the State repaid the full Federal share for the Westway project by October of 1995. Plaintiffs objected to this repayment mechanism, and instituted this action, claiming that DOT’s waiver of billing credits due to the State without legislative authorization to effect a repayment of the Federal share paid for the Westway property constitutes an illegal and unconstitutional payment out of the State treasury or funds under the State’s management (NY Const, art VII, § 7; State Finance Law § 4 [1]).
defendants’ procedural claims for dismissal
As an initial matter, the court cannot agree with the State’s contention that the complaint should be dismissed based upon plaintiffs’ failure to join the FHWA as a "necessary party” (CPLR 1001 [a]). The plaintiffs seek declaratory relief that the release of billing credits to repay the Westway Federal share violated the appropriations rules (NY Const, art VII, § 7; State Finance Law § 4 [1]) and budget bills (Public Authorities Law § 376 [1] [a]; L 1995, ch 54), and an "injunction directing DOT to recover the billing credits released to FHWA and the federal cash due and owing to the state’s General Fund” (see, complaint, at 11). Plaintiffs do not seek to directly recover the money from the Federal Government in this action, but merely request an order requiring DOT to do so. The FHWA Trust Fund will not be "inequitably affected” by a judgment in this *561 action so as to require it be named as a necessary party, complete relief is available to the parties in its absence, and dismissal on this ground is not warranted (see, CPLR 1003; Matter of Schulz v De Santis, 218 AD2d 256, 259-260 [3d Dept 1996]).
Further, the court is not persuaded that the equitable doctrine of laches should be invoked to bar plaintiffs’ claims, as defendants urge, based upon plaintiffs’ delay in commencing this action in March of 1996, despite their awareness in August of 1995 of DOT’s intent to utilize the waiver of billing credits to effect the Westway Federal share repayment. Defendants urge that, as a result of its timely $80 million repayment of the Westway Federal share by October of 1995, an additional $80 million was credited to this State’s apportionment out of the Federal Aid Trust Fund and the State’s obligation authority (valid until Oct. 1, 1996) increased by that amount, both pursuant to the Moynihan Amendment, and the State has used these funds in its 1995-1996 highway program. Nonetheless, plaintiffs timely commenced the action (see, CPLR 215 [4]) and are not requesting that a completed highway project be undone or funding be denied after the fact. Rather, plaintiffs seek a declaration of invalidity of the repayment mechanism utilized by DOT to settle a State debt and, if they prevail, the judgment would simply require the State to recoup the repayment and find an alternate, legal repayment method; this is not a situation involving a challenge "to public financing of such massive and profound dimension [so as to risk] traumatic disturbance to settled matters of public finances and governance” (Matter of Schulz v State of New York, 81 NY2d 336, 348). The Federal aid programs inject nearly $1 billion per year into the State highway program and involves an ongoing reimbursement and financing process, and entertaining a challengé to an $80 million repayment mechanism for a debt unquestionably owed by the State is not, under these facts, barred under the equitable doctrine of laches.
STANDING
 Plaintiffs instituted this citizen taxpayer action pursuant to State Finance Law article 7-A, which authorizes "any person, who is a citizen taxpayer * * * [to] maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who in the course of his or her duties has caused * * * a wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement *562 of state funds or state property” (State Finance Law § 123-b [emphasis added]). Plaintiff John Mylod alleges in the complaint that he is a citizen taxpayer and defendants do not argue otherwise; accordingly, he has standing to maintain this action pursuant to section 123-b of the State Finance Law (see, State Finance Law § 123-a). There are no allegations in the complaint that the remaining plaintiffs, which are not-for-profit corporations, pay any State taxes so as to qualify them for citizen taxpayer standing under article 7-A and they are dismissed (see, State Finance Law §§ 123-a, 123-b). Actions under article 7-A are "reserved to citizens-taxpayers and concern the disbursement or expenditure of State funds or State property” (Matter of Sullivan v Siebert, 70 AD2d 975 [3d Dept 1979]).[3] Section 123-b "does not create a substantive cause of action” (Matter of Lancaster Dev. v Power Auth., 145 AD2d 806, 807 [3d Dept 1988]). Where the Legislature has authorized a limited taxpayer’s suit, the statute is controlling and the courts should not confer common-law standing because doing so would ignore the expressed legislative policy to the contrary (see, Wein v Comptroller of State of N. Y., 46 NY2d 394, 399). Chester Civic Improvement Assn, v New York City Tr. Auth. (122 AD2d 715 [1st Dept 1986]) and other precedents which plaintiffs cite do not incorporate common-law associational standing principles (see, Matter of Dental Socy. v Carey, 61 NY2d 330) into article 7-A so as to authorize not-for-profit corporations to maintain taxpayer actions so long as some of their members are taxpayers[4] (see also, Matter of Aliona Citizens Comm. v Town of Altona, 77 AD2d 954 [3d Dept 1980], affd 54 NY2d 908 [standing of not-for-profit in combined CPLR article 78/action for declaratory judgment not addressed]; New York Pub. Interest Research Group v Steingut, 40 NY2d 250 [standing issue not addressed]). Plaintiffs’ attempt to import common-law standing principles into the taxpayer standing statute and to confer standing upon any not-for-profit corporation which has taxpay *563 ers among its members is unavailing. Further, plaintiffs must establish that State funds were expended to maintain an action under article 7-A.
THE BILLING CREDIT REPAYMENT
The novel substantive issue presented on these motions is whether DOT’s release/waiver of billing credits — representing money due the State from the Federal Government as reimbursement for Federal aid highway projects — in the absence of a legislative appropriation constituted payment out of the State treasury or funds under its management. The question presented herein is an important one, in view of the approximately $1 billion in Federal aid for highways this State receives each year combined with the reimbursable nature of the Federal highway program in which the Federal Government makes periodic reimbursement to the State for moneys expended on Federal aid highway projects. Article VII, § 7 of the State Constitution provides, in relevant part, that "No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law”. State Finance Law § 4 (1), adopted recently in 1981, similarly provides that "no money shall be paid from any fund under the management of the state, or any agency or officer thereof except in pursuance of an appropriation by law.”
The State contends that the billing credits are not State funds or funds under State management or control, but instead are Federal funds controlled and held by FHWA, although ultimately destined to be paid to the State as reimbursement. The State emphasizes that the billing credits represent funds not yet paid to the State or placed in the State treasury, and that FHWA could have withheld these funds to reimburse the Federal Government the Federal share of the Westway project. Plaintiffs by contrast argue that, where the billing credit funds were indisputably owed and payable to the State, which had submitted vouchers for reimbursement, and FHWA had approved the project and payment of funds, the Federal Government was statutorily and contractually obligated to pay them (23 USC § 106 [a]). Upon approval of the State’s vouchers, FHWA was obligated to pay them as directed by the DOT (23 USC § 121 [e]), and the funds were thus "under the management” of the State — although still in the United States Treasury — as contemplated by State Finance Law § 4 (1) and article VII, § 7 of the NY Constitution. Further, plaintiffs urge, if *564 physical custody and control of funds are determinative conditions of the statutory and constitutional legislative appropriation requirements at issue, then State agencies will have unfettered discretion to direct payment and dispose of such Federal-source reimbursement monies without legislative authorization, the very evil sought to be remedied by the appropriation requirements.
In analyzing whether the billing credit funds fall within the purview of the appropriation requirements, this court is guided by Anderson v Regan (53 NY2d 356 [1981]) in which a sharply divided Court of Appeals addressed the issue of whether Federal funds which are actually received by the State and placed within a joint custody account[5] within the State treasury must be appropriated by the Legislature before they may be disbursed by the Executive Department. Decided before State Finance Law § 4 was enacted, Anderson involved a constitutional challenge to the executive branch practice of receiving Federal funds and placing them in the State treasury for administrative convenience and then disbursing them directly to the responsible State agencies (supra, at 359). Noting that the wording of article VII, § 7 of the NY Constitution is "clear and uncomplicated”, the four-member majority concluded that "[s]o long as the funds are placed within the State treasury, the clear language of the Constitution prevents their removal without legislative authorization” (supra, at 360). Because the funds had actually been deposited in the State treasury, they "[fell] within both the literal language and the underlying purpose of the constitutional provision” (supra, at 358). Although the predecessor of this constitutional provision was adopted in 1846, well before the advent of a massive role for Federal funds in the State’s treasury, the concerns motivating its adoption "remain of equal concern today”; the "appropriations rule was part of an effort by the framers * * * to superimpose a measure of legislative control over the then unbridled power of the executive branch to spend” (supra, at 364, 363-364). The Court was persuaded that, while significant limitations are placed upon the expenditure of Federal funds, none of the Federal funding programs is self-executing, and indeed the "States retain a measure of discretion in applying *565 most of these funds to specific local needs”[6] (supra, at 366-367). Bypassing the appropriation rule disrupts the delicate balance of powers that exists between the legislative and executive branches relating to spending power and the budget-making process, and violates "the fundamental principle embodied in section 7 of article VII — i.e., that control of the pursestrings of the State treasury resides in the Legislature” (supra, at 367).
State Finance Law § 4 was adopted during the pendency of the appeal of Anderson (supra) to the Court of Appeals at a time when "moneys received from federal and other sources [were in practice being] expended by state agencies without legislative authorization” and was "intended to reinforce the subject constitutional mandate and prescribe the process by which it shall henceforth be carried out” (see, State Finance Law § 4, Historical and Statutory Notes, McKinney’s Cons Laws of NY, Book 55, at 14; L 1981, ch 405, § 2 [Statement of Intent and Purpose] [emphasis added]; see also, Anderson v Regan, supra, 53 NY2d, at 365).
The Anderson Court distinguished its decision in Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund (22 NY2d 119 [1968]) in which it held, by a 4-3 vote, that money raised through legislative assessments and immediately deposited in a separate fund administered by a legislatively created public benefit corporation was not covered by the constitutional appropriation rule. The holding was predicated upon the fact that the money in issue never became the property of the State and was never placed within the State treasury, and thus was not under the management of the State — which factors distinguished it from the situation in Anderson (Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund, supra, at 122-124; Anderson v Regan, supra, 53 NY2d, at 360). In both instances, the Court was concerned with vindicating the underlying purpose of and motivation for NY Constitution, article VII, § 7, that is, in the absence of legislative control over expenditures, there is a danger the executive branch could overspend, i.e., incur obligations in excess of actual income, and thereby commit the State *566 to obligations which will ultimately have to be met by the State’s taxpayers (Anderson v Regan, supra, at 364; Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund, supra, at 124). This danger was of great concern in Anderson in view of the potential for the executive to overspend in anticipation of Federal revenues; this concern would appear equally applicable in the motion sub judice in which the agency has not yet received the Federal aid reimbursement, as in Anderson where the executive had actually received the funds and placed them in the State treasury. The concern was not evident in Saratoga Harness because the fund into which the revenues were deposited could not obligate the State and the Fund’s expenditures were limited to its income (supra, at 124).
Anderson (supra), which involved Federal funds actually placed in the State treasury, instructs that such funds are literally State funds which must be appropriated to be spent. Saratoga Harness (supra), which involved State revenues placed in a private legislatively created fund, are neither funds in the State treasury nor under the management of the State. Neither precedent is directly on point with the issue here, i.e., whether Federal funds due but not yet paid to the DOT are under the management of the State as contemplated by the constitutional and statutory appropriation rules. Saratoga Harness is more factually analogous in that it concerned revenues never deposited in the State treasury (but managed by a legislatively created public benefit corporation) and determined not to be under State management. Anderson bolsters the interpretation that placement of funds into the State treasury is the determinative factor in invoking the appropriation rule, while not deciding the issue of whether such funds must be appropriated where the Comptroller withholds them from the treasury without legislative sanction, i.e., whether the rule might apply in some instances where funds have not yet been placed in the State treasury (Anderson v Regan, supra, at 361, n 6). Indeed, an early interpretation of the appropriation rule (then embodied in section 8 of article VII of the 1846 NY Constitution) concluded that moneys raised through all forms of taxation and paid to and held by a county treasurer, pursuant to statute, never became part of the State treasury or under management of the State (Matter of Clark v Sheldon, 106 NY 104, 112 [1887]; see also, Matter of Roosevelt Raceway v Monaghan, 9 NY2d 293; Matter of Blaikie, 11 AD2d 196, 202-203 [1st Dept 1960], lv denied 11 AD2d 928).
*567 Existing precedents strongly suggest that moneys on deposit in the State treasury must be appropriated, but do not: (1) resolve whether funds need to be on deposit in the State treasury to be "under the management” of the State, or (2) define when funds are under State "management” (see, Anderson v Regan, supra, 53 NY2d, at 368-370 [Jasen, J., concurring]; see also, Saratoga Harness Racing Assn. v Agriculture & N. Y. State Horse Breeding Dev. Fund, supra, 22 NY2d, at 129 [Breitel, J., dissenting] [opining that a fund which is an integral part of an agency, run by agency heads and charged with public duties, is in fact and in law under the "management” of the State]). The State treasury, of course, is "managed” jointly by the Comptroller and the Commissioner of Taxation and Finance (State Finance Law § 7). Whether the billing credits are under their "management” must ultimately turn on the nature of the Federal aid reimbursement program.
The Federal aid highway program is a reimbursable one. Generally, the FHWA approves proposed projects, extends obligation limits to the States (i.e., spending limits which the Federal Government obligates itself to reimburse States), the States provide the initial cash to get the project started, and the Federal Government reimburses States for the Federal share of costs actually incurred — often on an ongoing basis. Federal approval of a proposed project is deemed a "contractual obligation of the Federal Government for the payment of its proportional contribution thereto” (23 USC § 106 [a]). The Federal Government may, in its discretion, make payments as work progresses, and the State is entitled to payment of the unpaid balance of the Federal share of the project upon Federal approval of the State’s final voucher; the State may designate officials or accounts to which the funds are to be paid, provided they are authorized to receive public funds (23 USC § 121).
It is the conclusion of this court on this difficult question that the State’s entitlement to Federal reimbursement funds and the Federal Government’s contractual obligation to pay its Federal share are not tantamount to State control or ownership or management of the funds still held in Federal accounts. The Federal Government could at any time refuse to tender the reimbursement billing credit monies to the State — as it warned it would do to effect repayment for the Federal share of the abandoned Westway project — and litigation may ensue to determine the State’s entitlement to specific reimbursement in a given project. While the billing credits are due and owing to the State, and the State may designate an authorized payee, *568 the money does not come under State fiscal control until paid out to some State entity (see, Anderson v Regan, supra).
To be sure that DOT was able to, and in fact did, waive or release the billing credits to repay the FHWA Trust Fund suggests some indicia of State control or management of the money, but this repayment mechanism was authorized by the FHWA to ensure it would be timely reimbursed; there is no indication that DOT had "unfettered discretion” to control the funds still held by the Federal Government, or that the State had all the indicia and attributes of beneficial ownership or management. In essence, the Federal Government reimbursed itself with money entirely within its own control — which ultimately would have been paid to the State had the State repaid its Westway debt — and did so with DOT’S consent but would, and arguably could[7] —have done so unilaterally. That the State had the right to name a designee for the reimbursement funds (23 USC § 121 [e]) is not equivalent to having the funds under its "management” or being able to control, dispose of, invest or withdraw the funds. Under the Federal aid highway program, the Federal Government at any time owes reimbursement money to the State and holds money ultimately due to the State, but it cannot reasonably be concluded that such funds are under State management until actually paid.
The court is mindful that requiring — as plaintiffs urge— legislative appropriation of Federal reimbursement funds due the State would further the purposes underlying the appropriation rules of ensuring legislative control and oversight of executive spending (Anderson v Regan, supra, at 363-366), particularly in an era witnessing the increasing role of the Federal Government in State projects. However, this court concludes that money due and owing the State but never relinquished from Federal custody and control is not State funds or funding "under” the "management” of the State as those terms are used in NY Constitution, article VII, § 7 or State Finance Law § 4 (1). Of course, if the reimbursement had been paid to the State, DOT could not have repaid the Federal Government *569 with these funds from the State treasury without legislative authorization, as Anderson dictates. Until the funds are under State control or in the State treasury, they do not fall under the appropriation rules. This practice raises the arguably troubling spectre of executive agencies making decisions affecting considerable Federal aid reimbursement money due the State prior to the payment of the funds to the State, but an unwarranted and overly broad interpretation of the constitutional and statutory appropriation rules is not the proper remedy to correct this problem. To conclude that Federal funds such as these are under State "management” merely because they are due and owing to the State is not warranted by the judicial precedents or legislative / constitutional history, and would constitute a new precedent with potentially far-reaching ramifications.
This conclusion is also consistent with the official opinion of the chief fiscal officer of the State, the State Comptroller, addressing the legality of this specific repayment method under State Finance Law § 4 (1) and its constitutional progenitor (see, 1995 Opns St Comp No. SF 0995/065, Sept. 22, 1995 [unpublished]). The Comptroller determined the appropriation rules to be inapplicable in that "DOT did not make a payment from monies received from the federal government and under its management. Instead, and consistent with federal law, DOT agreed that the federal government would credit amounts otherwise available for reimbursement to the state for approved highway projects pursuant to Title 23 of the United States Code. This crediting mechanism does not fall within the language of either article VII, § 7, of the Constitution or Section 4(1) of the State Finance Law, requiring prior legislative appropriation. DOT does not have custody or control of the Federal funds at issue, and therefore, the appropriation requirements * * * are inapplicable” (ibid, [emphasis added]). This court so holds.
Plaintiffs further challenge the crediting mechanism as violative of an exclusive, specified statutory procedure for any State repayment of the Federal share of the abandoned West-way project. Plaintiffs argue that Public Authorities Law § 379 (1) (a) is that exclusive mechanism. That provision, adopted in 1991, certainly authorizes, but does not require, the Thruway Authority to issue up to $50 million in bonds and apply the proceeds to repay the Westway Federal share. The Capital Projects Budget (L 1995, ch 54) for FY 1995-1996 appropriated $40.1 million toward the repayment. These budget provisions *570 are permissive and. authorize issuance of bonds as one method to effect the Westway repayment but cannot be read to preclude other methods, and the statutory and constitutional appropriation rules do not make such a method mandatory.
For the foregoing reasons, the defendants’ motion for summary judgment is granted, and plaintiffs’ cross motion for partial summary judgment is denied.

. Westway was to have been designated 1-478.

. The "obligation authority” is the limit on the amount the State may spend on highway projects to which the Federal Government will be obligated during a specified period.

. Sullivan (supra) denied New York Public Interest Research Group standing under article 7-A, but it is unclear if it did so solely because no State funds were involved or also because it was a not-for-profit and thus not a citizen taxpayer.

. But see, State Communities Aid Assn. v Regan (112 AD2d 681, 682 [3d Dept 1985]) in which the Court stated that all plaintiffs had section 123-b standing and two of the plaintiffs were not-for-profit corporations. The reasoning of that ruling is unclear unless it was because "failure to allow standing would in effect erect an impenetrable barrier to any judicial scrutiny of legislative action” (Boryszewski v Brydges, 37 NY2d 361 [decided before art 7-A was adopted]).

. The funds were held jointly by the Comptroller and the Commissioner of Taxation and Finance in the State treasury.

. The majority in Anderson (supra) rejected the three dissenters’ conclusion that the distinction as to when Federal funds must be appropriated turns on whether the Federal Government has imposed express conditions on their use, i.e., if the Federal funds are conditioned, they never become a part of the State treasury or under State management but if no such conditions are imposed by Congress, they fall within the appropriation rule once received.

. Plaintiffs contend that 23 USC § 103 (e) (4)-(7) provides the exclusive remedy for the Federal Government to obtain repayment for a cancelled project, and that FHWA may not withhold billing credits due the State pursuant to 23 USC § 106 (a). Plaintiffs do not cite any precedent so holding, and the language of the statute does not compel that conclusion. In any event, the papers submitted on this motion do not permit or compel resolution of that legal issue, as the narrower issue presented is simply whether the State managed the funds and not whether the Federal Government could legally withhold them to effect the repayment.