# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 88
In the Matter of Randy Peyton,
&c.,
      Respondent,
Hillel Hoffman, et al.,
  Intervenors-Respondents,
     v.
New York City Board of Standards
and Appeals, et al.,
      Appellants.

Jonathan A. Popolow, for appellants New York City Board of Standards and Appeals, et al.
Philip E. Karmel, for appellant PWV Acquisition, LLC
Submitted by Henry M. Greenberg, for appellant Jewish Home Lifecare, Inc.
John R. Low-Beer, for respondent Randy Peyton and intervenor-respondents Hillel Hoffman, et al.
The Real Estate Board of New York, Inc.; Public School 163's School Leadership Team et al., amici curiae.

FEINMAN, J.:

The question before us is whether an area must be accessible to the residents of every building on a zoning lot containing multiple, separately owned buildings in order to constitute "open space" within the meaning of the New York City Zoning Resolution,

- 1 -

following amendments to the statute in 2011. The Board of Standards and Appeals of the City of New York (BSA), which is responsible for administering the Zoning Resolution, has interpreted the definition of open space to encompass rooftop gardens accessible to a single building's residents as long as the residents of each building on the zoning lot receive at least a proportionate share of open space. Because the BSA rationally interpreted and harmonized the relevant provisions of the Zoning Resolution, a complex statutory scheme regulating zoning in New York City, and appropriately applied them to this context, we conclude that its determination is not arbitrary, capricious, or contrary to law.

I.

The New York City Zoning Resolution, adopted in 1961 and still in force as amended today, aims to provide "open space in residential areas wherever practicable . . . in order to open up residential areas to light and air, to provide open areas for rest and recreation, and to break the monotony of continuous building bulk" (NY City Zoning Resolution § 21-00 [d]). To achieve this goal, the Zoning Resolution requires a minimum amount of open space—a term of art—in high-density residential zoning districts (*see id.* former §§ 23-14, 23-142).[1] The definition of open space, not substantively changed since enactment in 1961, provides:

> "'Open space' is that part of a ***zoning lot***, including ***courts*** or ***yards***, which is open and unobstructed from its lowest level to

---

[1] In 2016, amendments to the Zoning Resolution recodified certain provisions including sections 23-14 and 23-142. Former section 23-14 has been redistributed between current sections 23-10 and 23-15, and former section 23-142 between current sections 23-15 and 23-151.

the sky and is accessible to and usable by all persons occupying a ***dwelling unit*** or a ***rooming unit*** on the ***zoning lot***"[2]

(*id.* § 12-10 [definition of open space]). The minimum amount of open space required on a zoning lot is determined by the "open space ratio," which is "the number of square feet of open space on the zoning lot, expressed as a percentage of the floor area on that zoning lot" (*id.*). The applicable ratio is a function of the residential district in which the zoning lot is located and the "height factor" of the zoning lot (*see e.g.* ZR former § 23-142). Thus, the minimum amount of open space required on a zoning lot is calculated by multiplying the given open space ratio by the total residential floor area on the zoning lot.[3] Originally, a zoning lot had to be in single ownership, but the Zoning Resolution was amended in 1977 to authorize zoning lots consisting of parcels held by different owners.

The zoning lot at issue in this case is a superblock located between W. 97th Street, W. 100th Street, Columbus Avenue, and a midblock line east of and parallel to Amsterdam Avenue. It was developed in the late 1950s under a federally subsidized urban renewal plan. Three residential buildings, which form part of the Park West Village apartment complex, were built at that time. Shortly before a 40-year restriction prohibiting additional

---

[2] The Zoning Resolution uses bold italics to identify defined terms.

[3] The definition of open space ratio in ZR § 12-10 provides the following example:

> "[I]f for a particular ***zoning lot*** an ***open space ratio*** of 20 is required, 20,000 square feet of ***floor area*** in the ***building*** would necessitate 4,000 square feet of ***open space*** on the ***zoning lot***; or, if 6,000 square feet of ***lot area*** were in ***open space***, 30,000 square feet of ***floor area*** could be on that ***zoning lot***."

construction on the lot expired, respondent PWV Acquisition, LLC (PWV) acquired ownership of the zoning lot intending to develop additional buildings on the property. In 2006, PWV submitted a building permit application to the New York City Department of Buildings (DOB) for a mixed-use building at 808 Columbus Avenue, with two one-story retail wings, each with a rooftop garden exclusively accessible to the new building's residents. PWV's architects presented site plans that treated the rooftop gardens, covering tens of thousands of square feet, as open space within the meaning of the Zoning Resolution and reserved additional space for a future community building. Based on the architects' assumption that the rooftop gardens qualified as open space despite their inaccessibility to the residents of the existing Park West Village apartment complex, the architects stated there would be enough open space to satisfy the minimum amount required on the zoning lot after construction of 808 Columbus Avenue[4] and the future community building. Further, the architects represented that each building on the zoning lot would receive at least its proportionate share of open space.

Several elected officials and Park West Village residents objected that the rooftop gardens did not qualify as open space under the Zoning Resolution because they were not accessible to all residents of all buildings on the zoning lot. Discerning no such requirement in the Zoning Resolution, the DOB rejected the challenge and approved the proposed open-space calculations. In 2009, the BSA upheld the DOB's determination, noting that each of the existing buildings was allocated a proportionate amount of open space in excess of what

---

[4] In 2007, PWV transferred the parcel on which the new building was to be built to a different owner.

would be required if each building were located on its own zoning lot, and finding that the proposed allocation did not violate the open-space requirements under ZR §§ 12-10 and 23-142. The residents commenced a CPLR article 78 proceeding but soon discontinued it with prejudice. The 808 Columbus Avenue building was completed in 2010.

In 2011, the City Planning Commission adopted amendments to the definition of certain key terms in the Zoning Resolution. As part of this revision, the Commission also made nonsubstantive changes to clarify the meaning of various provisions and update obsolete language in line with DOB practice. Included in this latter category were nonsubstantive changes to the sections relating to minimum required open space and open space ratio, which clarified that those requirements apply to zoning lots, not buildings. For instance, references to the term "building" were deleted in former section 23-142:

> "[I]n the districts indicated, the minimum required ***open space ratio*** and the maximum ***floor area ratio*** for any ~~building on a zoning lot~~ shall be as set forth in the following table for ~~buildings~~ ***zoning lots*** with the ***height factor*** indicated in the table."[5]

No changes were made to the definition of open space.

That same year, respondent Jewish Home Lifecare, Inc. (JHL) entered into an agreement with PWV to build and operate a nursing facility at the location designated in the 2006 site plans for the prospective community building. According to JHL's site plans,

---

[5] Text in strikeout was deleted; underlined text was added (*see* Key Terms Clarification Zoning Text Amendment, https://www1.nyc.gov/assets/planning/download/pdf/plans/key -terms/text_adopted_cc.pdf).

the amount of open space to be provided would satisfy the minimum required, assuming that the rooftop gardens at 808 Columbus Avenue counted toward the total.

After the DOB approved JHL's application, petitioner Maggi Peyton, then president of the Park West Village Tenants' Association, challenged the issuance of the permit, arguing that the proposed nursing home did not satisfy the Zoning Resolution's open-space requirements. The DOB rejected the challenge, determining that the amount of open space proposed was in excess of the minimum required. On appeal to the BSA, Peyton argued that amendments to the Zoning Resolution enacted in 2011 superseded the BSA's 2009 determination and made plain that, to constitute open space, an area must be accessible to the residents of every building on a zoning lot. In 2015, the BSA denied her appeal, noting, among other things, that there was no indication that the City Planning Commission had intended to alter the BSA's 2009 determination. Specifically, the BSA stated that the only question before it was whether the 2011 amendments to the Zoning Resolution "changed the language of the text such that it now reads as [a]ppellant argued in the 2009 appeal, and whether the open space requirements are changed in such a way as to implicate the proposed construction of the Nursing Facility." The BSA rejected Peyton's argument that the amendments effectively changed the definition of open space to include only space that is accessible to and usable by all residents of all buildings on a zoning lot.

Peyton commenced this CPLR article 78 proceeding in November 2015, asserting that the BSA's interpretation of open space had no legal basis under the Zoning Resolution. Supreme Court denied the petition, rejecting her contention that the 2011 amendments modified or clarified the definition of open space, and concluding there was "enough

ambiguity to defer to the DOB's practical construction of the ordinance." The Appellate Division reversed over one Justice's dissent (166 AD3d 120).[6] Declining to defer to the BSA, the majority opined that the definition of open space in ZR § 12-10 unambiguously requires that open space be accessible to the residents of every building on a zoning lot. By contrast, the dissent concluded that the statute was ambiguous and would have deferred to the BSA's practical reading of the open-space definition as applied to multi-owner zoning lots. The Appellate Division granted respondents' motion for leave to appeal to this Court.[7]

## II.

In matters of statutory interpretation, "legislative intent is the great and controlling principle" (*Matter of Rizzo v New York State Div. of Hous. & Community Renewal*, 6 NY3d 104, 114 [2005] [internal quotation marks omitted]). Because "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Kuzmich v 50 Murray St. Acquisition LLC*, 34 NY3d 84, 91 [2019] [internal quotation marks omitted],

---

[6] Peyton passed away during the appeal. The Appellate Division allowed her son to maintain the proceedings on her estate's behalf and granted intervention to additional petitioners.

[7] Before the BSA and in the courts below, respondents raised substantial objections to petitioners' ability to challenge, in this application seeking a building permit for the proposed nursing home, the BSA's previous determination that the one-story rooftop gardens at 808 Columbus Avenue constitute open space. In this Court, the BSA—but not PWV or JHL—has largely abandoned these objections and asked the Court to review the BSA's interpretation and application of ZR § 12-10, which the Appellate Division rejected. Given our resolution of the statutory interpretation issue, we have no occasion to address the continued objections of PWV and JHL.

*rearg denied* 33 NY3d 1135 [2019], *and cert denied* 140 S Ct 904 [2020]). Courts generally "construe words of ordinary import with their usual and commonly understood meaning" (*Walsh v New York State Comptroller*, 34 NY3d 520, 524 [2019] [internal quotation marks omitted]), "unless the Legislature by definition or from the rest of the context of the statute provides a special meaning" (*Lohan v Take-Two Interactive Software, Inc.*, 31 NY3d 111, 121 [2018] [internal quotation marks omitted]). A statute "must be construed as a whole," and "its various sections must be considered together and with reference to each other" (*Town of Aurora v Village of E. Aurora*, 32 NY3d 366, 372 [2018] [internal quotation marks omitted]). Further, in appropriate circumstances, the Court may "inquire into the . . . purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history" (*id.* [internal quotation marks omitted]).

"Where the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]). If the agency's "interpretation is not irrational or unreasonable, it will be upheld" (*id.*). The BSA is the "ultimate administrative authority charged with enforcing the Zoning Resolution" (*Matter of Toys "R" Us v Silva*, 89 NY2d 411, 418 [1996]). It is "comprised of experts in land use and planning," who not only possess technical knowledge of New York City's reticulated zoning regulations and their operation in practice, but also are uniquely equipped to assess the practical implications of zoning determinations affecting the City's eight million residents. Accordingly, we have

consistently deferred to the BSA's interpretation of the Zoning Resolution in matters relating to its expertise, "so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute" (*Toys "R" Us*, 89 NY2d at 418-419 [internal quotation marks omitted]; *see also Matter of New York Botanical Garden v Board of Stds. & Appeals of City of N.Y.*, 91 NY2d 413, 418-419 [1998]).

Conversely, when "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency," and its interpretation is "therefore to be accorded much less weight" (*Kurcsics*, 49 NY2d at 459; *accord Toys "R" Us*, 89 NY2d at 419). If an agency's interpretation "disregard[s] the plain meaning of the Zoning Resolution," courts will afford it "little weight" (*Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 106, 103 [1997]). Still, "deference is appropriate where the question is one of specific application of a broad statutory term" (*Matter of O'Brien v Spitzer*, 7 NY3d 239, 242 [2006] [internal citations and quotation marks omitted]).

Petitioners focus on the first sentence of the definition generally describing open space as "that part of a ***zoning lot***, including ***courts*** or ***yards***, which . . . is accessible to and usable by all persons occupying a ***dwelling unit*** or a ***rooming unit*** on the ***zoning lot***" (ZR § 12-10). For petitioners, "persons occupying a dwelling unit or a rooming unit" is an elaborate way of referring to residents generally, making the meaning of this text plain:

open space must be accessible to all persons residing on the zoning lot.[8] Respondents, on

the other hand, explain that the terms "dwelling unit" and "rooming unit" cannot be ignored

and are defined by reference to a residential building (*see* ZR § 12-10 [defining "dwelling

unit" as a unit that "contains at least one ***room*** in a ***residential building*** . . . and is arranged,

designed, used or intended for use by one or more persons living together and maintaining

a common household"]; *id.* [defining "rooming unit" as a unit that "consists of any 'living

room,' as defined in the Multiple Dwelling Law, in a ***residential building***"]). By focusing

on accessibility to residents of a residential building, as opposed to residents of a zoning

lot generally, the BSA's interpretation gives salience to a concept that is cross-referenced

in the definition of open space, whereas petitioners narrowly look at a string of words in

isolation.[9] In this respect, the BSA's approach better comports with the principle that a

statute "must be construed as a whole and that its various sections must be considered

---

[8] The dissent states that there is "only one plain way to read that language" and then backtracks to acknowledge the phrase's textual ambiguity, which it resolves by considering the extratextual "purpose" of open space (dissenting op at 2, 4). We decline to cherry-pick the sources of legislative intent in that way.

[9] The term "building" historically included "a row of garden apartments with individual apartments" and "a series of row homes," and still includes attached townhouses separated by fire walls (*compare* ZR § 12-10 [definition of "building"] [1961], *with id.* [2020]). The definition of open space encompasses spaces—such as "courts," "yards," and certain roof areas—that are accessible only through a building. Indeed, a "court" may be an "inner court" bounded by building walls, and a "yard" may be a "rear yard" (*see* ZR § 12-10 [definitions of "court," "court, inner," "yard," and "year, rear"]). And certain roof areas may only be "accessible by a passageway from a ***building***, or by a ramp . . . from a ***building***" (*id.* [definition of "open space"]). Therefore, the Zoning Resolution, on its face, does not appear to foreclose the possibility of separate buildings on a zoning lot with their own open space.

together and with reference to each other" (*Matter of New York County Lawyers' Assn. v Bloomberg*, 19 NY3d 712, 721 [2012] [internal quotation marks omitted]).

The complex set of cross-references and interlocking provisions in the Zoning Resolution's definition of open space counsels deference here. The provision at issue is part of an intricate statutory edifice with which the BSA is most familiar. The definition of open space in ZR § 12-10 comprises no less than 13 defined terms, many of which cross-reference other defined terms. As noted, "open space" points to occupants of "a *dwelling unit*," a phrase defined as "contain[ing] at least one room in a *residential building*, *residential* portion of a *building*, or *non-profit hospital staff dwelling*," which directs the reader to at least four other terms with specific technical meanings in the zoning context." For a glimpse of how the definition of open space is intertwined with other definitional and substantive provisions of the Zoning Resolution, one need only turn to the requirements for roof areas. To determine whether a roof area qualifies as open space, one must, among many other things, consider whether the area is higher than 23 feet above the "curb level," and if so, consult sections 24-164 and 35-33. The former instructs that a qualifying roof area may be higher than 23 feet above curb level if located on "the roof of the *community facility* portion of such *building*, provided that the level of any *open space* may not be higher than two and one half feet below the sill level of any *legally required window* opening on such roof area" (*id.* § 24-164). And the latter elaborates that such roof area may be provided, among other options, on the roof of "a *community facility building* that *abuts* such *residential building* or *residential* portion of a *mixed building*; provided that the level of any *open space* may not be higher than 2 feet, 6 inches below the sill level of any *legally*

*required window* opening on such roof area, in the *residential* portion of such *mixed*

*building*" (*id.* § 35-33). When the DOB and the BSA examine whether a particular area

qualifies as open space, they have to consider all of these interconnected definitions and

provisions jointly. The BSA's interpretation of the definition of open space reflects a

holistic approach, and we cannot overlook that the agency charged with administering the

Zoning Resolution in all its complexity is well placed to understand how the various parts

of the statute fit together.[10]

---

[10] Citing *Toys "R" Us* and *Raritan*, the dissent categorically declares that no deference is warranted "when interpreting the Zoning Resolution's interlocking set of definitions" (dissenting op at 9). Neither case provides support for that sweeping proposition.

In *Toys "R" Us*, the Court examined the text, legislative history, and underlying public policy of a provision of the Zoning Resolution on abandonment of "substantially all" nonconforming uses (89 NY2d at 420-422). Although the Court had no obligation to defer to the BSA in fixing the meaning of the phrase "substantially all," it nevertheless approved the agency's interpretation, praising it for "giv[ing] effect to all of the [Zoning Resolution's] terms" and "comport[ing] with the policy underlying the Zoning [Resolution]" (*id.* at 419, 422). Further, the Court recognized the BSA's expertise in applying the abandonment standard to fact-specific scenarios. *Toys "R" Us* thus illustrates the wisdom of giving due consideration to the BSA's synoptic understanding of the Zoning Resolution's structure.

In *Raritan*, the question was whether "floor area" excludes "cellar space" (91 NY2d at 100-101). The interpretive problem was self-contained to the definition of floor area because both parties stipulated that the space in dispute was a "cellar" under the Zoning Resolution (*id.* at 101). Since the definition of floor area specifically provided that "the floor area of a building shall not include . . . cellar space," the statutory text resolved the dispute on its face (*id.* at 103). The Court understandably rejected the BSA's reliance on a previous wording of the definition of floor area (*id.*).

Here, by contrast, the definition of open space does not compel petitioners' preferred interpretation, and the many cross-references in that definition require us to consider the broader context of the Zoning Resolution's interlocking provisions. Further, the operative definition of open space has not changed since the BSA's 2009 determination, arguably signaling legislative approval of the BSA's approach.

The legislative history of the Zoning Resolution further supports the BSA's interpretation. An early draft of the Zoning Resolution, contained in a report commissioned by the City Planning Commission, described open space as accessible to "all residents upon the zoning lot" (Voorhees Walker Smith & Smith, Report to NY City Planning Commn, Proposed Zoning Resolution § 12-10, at 34 [Aug. 1958])—precisely the view espoused by petitioners here. But the City Planning Commission did not adopt that simplistic formulation, preferring the more precise and complex "all persons occupying a ***dwelling unit*** or a ***rooming unit*** on the ***zoning lot***"—which, as discussed above, incorporates the concept of residential building by cross-reference. Additionally, the handbook published by the City Planning Commission contemporaneously with the 1961 Zoning Resolution characterized open space as "accessible to all residents of a building" (NY City Planning Commn, Zoning Handbook at 17).

In any event, when the 1961 Zoning Resolution was adopted, zoning lots were held in single ownership. The drafters did not contemplate the possibility of multi-owner zoning lots, where access to any individual building by the residents of other buildings on a zoning lot might not be feasible for both practical and legal reasons.[11] This history gives further

---

[11] The dissent professes its inability to "reconcile the majority's conclusion that the legislative history supports the BSA's reading if, as the majority claims, the drafters of the Zoning Resolution did not envision the situation that has arisen here" (dissenting op at 12). We see no reason for perplexity. The fact that the Zoning Resolution's text and legislative history permit the BSA's building-centric approach does not mean that the drafters in 1961 anticipated the complications of providing access to open space on a multi-owner zoning lot.

credence to the BSA's reading of the statute, which is sufficiently capacious to embrace the BSA's rational solution to a problem unanticipated by the Zoning Resolution's drafters. Based on its accumulated experience with the implementation of open space requirements across the City's residential districts, the BSA enjoys special insight into the DOB's operational practices, including procedures regarding access (such as manner and time restrictions) and use, as well as allocation and calculation of minimum required open space. We cannot ignore the agency's judgment about the feasibility of competing approaches, especially where the interpretive question involves the application of a broad statutory definition to a situation—multi-owner zoning lots—that the Zoning Resolution does not expressly address.[12]

In contrast, petitioners suggest that the drafters of the 1961 Zoning Resolution embraced a "tower-in-the-park vision" that prized large zoning lots with multiple buildings surrounded by shared open space. Yet they do not cite any statement of intent or other

---

[12] The dissent casts aside the BSA's expertise and experience and, seemingly fancying itself as a land-use expert, states that the answer is cut and dried: "to qualify as open space, a given area must be accessible to 'all persons' who reside on the zoning lot" (dissenting op at 3-4). Of course, removing words from the definition of open space makes it simpler and easier to parse. But if those omitted words are meaningless, why did the City Planning Commission include and adopt them? The omitted words remained after both the 2011 and 2016 amendments—unlike the dissent, the Commission chose not to remove them, indicating their significance. Further, the dissent probably does not mean what it broadly proclaims. For example, we doubt (though do not decide) that preventing residents from access when a space reaches a certain occupant load would render the space no longer "open space." Nor would restricting access to all residents after midnight. Or even at all times during a COVID-19 outbreak. Neither would banning certain residents who at one time violated a rule on the use of the space or did not pay their use fees. What about allowing the space to be reserved by a resident for a private event one evening?

language in the Zoning Resolution that favors "towers-in-the-park projects" on large superblocks. Instead of dictating the size of zoning lots, the Zoning Resolution requires a minimum amount of open space as a percentage of residential floor area. The BSA's interpretation meets that requirement by ensuring that the residents of each building on a multi-owner zoning lot have access to at least the amount of open space that would be required if the building were on a separate zoning lot. By allocating open space in this way, the BSA's interpretation fulfills the purpose of the open-space requirement, which is "to open up residential areas to light and air, to provide open areas for rest and recreation, and to break the monotony of continuous building bulk" (ZR § 21-00 [d]).

Nor is there any merit to petitioners' contention that the 2011 amendments to the Zoning Resolution ratified their interpretation of the statute. The 2011 amendments deleted references to "building" and replaced them with references to "zoning lot" in the definition of open space ratio and in former sections 23-14 and 23-142 relating to minimum required open space. These provisions, however, do not govern what constitutes open space or how to allocate open space among buildings on a zoning lot. Rather, they set forth how to calculate the minimum amount of required open space based on the ratios applicable to residential districts for given height factors.[13] Further, nothing in the legislative history of the 2011 amendments indicates that the City Planning Commission intended to make

---

[13] It is undisputed that the calculation of minimum required open space using the ratios listed in sections 23-14 and 23-142 was the same before and after the 2011 amendments.

substantive changes to the definition of open space in response to the BSA's 2009 resolution. That silence cuts against petitioners' argument.

The BSA's interpretation is rational as applied to multi-owner zoning lots. The text, structure, history, and purpose of the definition of open space show that the BSA's interpretation is consistent with—and indeed furthers—the legislative intent of the Zoning Resolution's drafters. Giving due consideration to the BSA's technical knowledge of the implications for the City's development of its application of the statute, we conclude that the BSA's application of the definition of open space to multi-owner zoning lots is not arbitrary, capricious, or contrary to law.

Accordingly, the Appellate Division order should be reversed, with costs, the judgment of Supreme Court reinstated and the certified question not answered as unnecessary.

WILSON, J. (dissenting):

"'Open space' is that part of a zoning lot, including courts or yards, which . . . is accessible to and usable by all persons occupying a dwelling unit or a rooming unit on the zoning lot" (NY City Zoning Resolution § 12-10)

(hereinafter "ZR").[1]  There is only one plain way to read that language: unless all persons residing in apartments on a zoning lot can access and use a particular space, that space does not count as "open space."   Appellant PWV Acquisition, LLC (PWVA) proposes a different reading: because the Zoning Resolution specifies that open space must be accessible to all persons occupying "a" dwelling unit, the word "a"—as PWVA notes— can be read to mean that if all the residents of just one apartment on a zoning lot can access and use a space, that space is "open space".  That reading may be a grammatically correct alternative, but it is absurd.   No party contends that New York City's open space requirements could be satisfied by giving a single luxury penthouse apartment a football-field sized private roof deck.

It would be one thing if the Board of Standards and Appeals (BSA) had adopted one of those two interpretations, but it has not.  Instead, the BSA advocates for a third definition of "open space," one that is wholly absent from the language of the Zoning Resolution. The lack of any statutory support for the BSA's interpretation renders the majority's lengthy discussion of the principles of administrative law and deference to agency expertise entirely irrelevant.  Agencies cannot rewrite the statutes that empower them; that function is legislative, not administrative.  The majority does not make a credible case that the BSA's interpretation can be found in the statutory language.  Instead, it concludes we must defer to the BSA's interpretation, regardless of the disconnect between that interpretation

---

[1] The Zoning Resolution utilizes a bold and italicized typeface to identify terms that are defined elsewhere in the resolution.  For ease of comprehension, and to avoid confusion with my own emphasis, I have omitted the resolution's bold italics throughout this opinion.

and the clear language of the statute, because the Zoning Resolution uses words that refer to other words and because land use law is complicated. That reasoning contravenes basic principles of statutory interpretation. Accordingly, I dissent.

Open space serves important physical and social functions, particularly in a city as tall and dense as New York. To ensure residents have access to a minimum amount of open space, New York City mandates that developers in certain residential districts set aside areas for open space. The amount of space required varies depending upon, among other factors, the height, use, and square footage of the buildings on the zoning lot (*see e.g.* ZR § 12-10 [defining "open space" and "open space ratio"]; *id*. § 23-144 [noting distinct open space requirements that apply to affordable residents for seniors]). Reflecting the multifaceted purpose of open space, the City's Zoning Resolution sets forth two principal criteria for open space.[2] First, in order to count towards a zoning lot's quota for open space, an area must be "open and unobstructed from its lowest level to the sky" (ZR § 12-10), providing pathways for light and air to permeate a development. Second, the area must be "accessible to and usable by all persons occupying a dwelling unit or a rooming unit on the zoning lot" (*id.*).

The straightforward, sensible and compelling way to read the accessibility requirement is that to qualify as open space, a given area must be accessible to "all persons"

---

[2] As indicated above, the Zoning Resolution also contains additional requirements and context-specific exceptions depending on the design and categorization of the building. For example, open space can be covered by a roof, provided that the roofed area "is not enclosed on more than one side" and does not exceed "10 percent of the unroofed or uncovered area" of the zoning lot (ZR § 12-10).

who reside on the zoning lot.[3]  That natural reading gives meaning to the plain language of the statute.  Furthermore, it reflects the purpose for which open space exists: to give residents outdoor areas in which to enjoy light, air and recreation (*see* ZR § 21-00 [d]).  The second possible reading is one that the appellant-developers, PWVA, note in passing, although they do not champion it.  The phrase "accessible to . . . all persons occupying 'a' dwelling unit" could be interpreted to mean that an area counts as open space if it is accessible to "all persons" who live in *at least one* dwelling unit.  Appellants' lack of enthusiasm for that reading undoubtedly stems from its unpalatability when one has the purpose of open space in mind.  Under that reading, a private rooftop garden or large private tennis court would qualify as open space, negating much of the purpose behind including the accessibility requirement in the first place.[4]

---

[3] The majority quotes this sentence and then offers a smorgasbord of hypothetical challenges.  The majority questions how the straightforward reading of the statute could be squared with the need to "prevent[] residents from access[ing an open space] when a space reaches a certain occupant load" or when "during a COVID-19 outbreak" crowded use of the open space would threaten public health (majority op at 14 n 12).  My conclusion that the drafters of the Zoning Resolution intended for open spaces to be accessible to all residents of a zoning lot—for the purposes of securing a building permit—does not somehow compel the conclusion that the drafters had either the intention or the authority to override all fire safety ordinances and emergency public health regulations, or that the existence of such regulations suggests one interpretation of the Zoning Resolution over another.

[4] The majority states that my understanding of the purpose of open space is "extratextual" (majority op at 10 n 8).  Not so.  Section 21-00 (d) lists as one of the "specific purposes" of the Zoning Resolution the aim of ensuring the "provision of open space in residential areas wherever practicable . . . in order to open up residential areas to light and air [and] to provide open areas for rest and recreation."  Such spaces are meant to serve the "general welfare" (*id.* § 21-00).  In addition, the language of section 12-10 provides ample evidence that the legislature intended for "all persons . . . on the zoning lot" to have access to open space.  The PWVA's contrary reading relies upon the far-fetched proposition that the

Rather than adopt one of the two possible readings of the statute, the BSA has selected a third position, one that appears nowhere in the statutory text. According to the BSA, the definition of "open space" encompasses areas that are: (a) accessible to all residents of an adjoining building, even if (b) those areas are not accessible to residents of other buildings on the zoning lot, provided that (c) the resulting division of open space is not "inequitable." None of the operative criteria relied upon by the BSA exists in the statute, which makes no allowance for open space to be siphoned off into separate areas of exclusive recreation. Indeed, the Zoning Resolution does not discuss dividing open space in any manner. Instead, it requires a plain and simple directive: areas may only count as "open space" if they are accessible to "all persons . . . on the zoning lot" (ZR § 12-10). The BSA's interpretation therefore not only strays far from the text, it contradicts the plain language of section 12-10, which does not permit developers to count as open space areas that are useable by "some" but not "all" persons on the zoning lot. The BSA's interpretation of the Zoning Resolution may be a reasonable policy position, and if this were a community meeting, a class on urban planning or—best of all—a legislative committee meeting, they could have an in-depth discussion of the merits of the BSA's

---

legislature, when it specified that "all persons" must have access to open space, was primarily concerned with eliminating unequal access to open space among residents within a single dwelling unit rather than across dwelling units. That hypothetical legislative purpose is wholly absent from the legislative history and does not provide a basis for adopting the PWVA's literal (but inane) reading of the statute (*see Milbrandt v A.P. Green Refractories Co.*, 79 NY2d 26, 36 [1992]). In any event, the majority has selected neither of those two possible readings, and instead adopted a third reading that lacks any statutory support.

proposed vision for open space in New York City. However, as a matter of statutory interpretation, the BSA's proposed reading is statutorily unauthorized.

The BSA's unfounded reading of the statute cannot be saved by appeals to administrative deference. The question presented on this appeal is an issue of pure statutory interpretation. In such cases, our precedent is clear: where "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent," we need not rely upon "any special competence or expertise of the administrative agency" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]). And, of course, if an agency's interpretation "runs counter to the clear wording of a statutory provision, it should not be accorded any weight" (*People v Francis*, 30 NY3d 737, 746 [2018], quoting *Roberts v Tishman Speyer Props., L.P.*, 13 NY3d 270, 285-286 [2009] and *Kurcsics*, 49 NY2d at 459).

Applying that standard, we have repeatedly declined to defer to the BSA's interpretation of the Zoning Resolution when, as here, the question involved is one of purely statutory interpretation (*see e.g. Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 107 [1997] [declining to defer to the BSA's interpretation of "floor area" contained in section 12-10 of the Zoning Resolution, the same definitional section we interpret today]; *Matter of Toys "R" Us v Silva*, 89 NY2d 411, 419 [1996] [concluding that "the appropriate legal standard for (determining the meaning of) abandonment under Zoning Resolution § 52-61" is one without "deference to the BSA" because its resolution involves "a pure legal

question"]).[5]  In this case, the question presented—what was the legislature's intent in enacting section 12-10 of the Zoning Resolution?—is a purely legal question, and, therefore, deference to the BSA is unwarranted.

Even if, for whatever reason, we decided to disregard settled precedent and afford deference to the BSA, we nonetheless would have to consider carefully whether there is a "rational basis" for the agency's interpretation of the statute (*Fisher v Levine*, 36 NY2d 146, 150 [1975]).  Here, because the BSA's interpretation of the statute is neither of the

---

[5] The majority's attempts to distinguish *Toys "R" Us* and *Raritan* are unpersuasive.  Both cases applied our longstanding framework for deference to administrative agencies, starting with the premise that "[w]here 'the question is one of pure legal interpretation of statutory terms, deference to the BSA is not required'" (*Raritan Dev. Co.*, 91 NY2d at 102, quoting *Toys "R" Us*, 89 NY2d at 419).  In both cases, we determined that the relevant statutory questions involved "pure legal question[s] that do[] not mandate deference to the BSA" (*Toys "R" Us*, 89 NY2d at 419; *Raritan Dev. Co.*, 91 NY2d at 103 [declining the BSA's invitation to "ignore the obvious interpretation of the Zoning Resolution"]).  The majority makes no real attempt to argue that the question presented in this case, even if it involves interlocking statutory definitions, is anything but a "pure legal question" (*Toys "R" Us*, 89 NY2d at 419).  We should therefore reach the same result that we did in *Toys "R" Us* and *Raritan* and conclude that no deference is owed to the BSA.  In *Toys "R" Us*, after concluding that the "appropriate legal standard" was one without deference to the BSA, we nonetheless agreed with the BSA as to the proper reading of the Zoning Resolution, but we did so after an independent inquiry into the meaning of the statute, unaffected by deference to the BSA (*see id.* at 419-422).  Here, the majority makes no effort to conduct an independent inquiry into the meaning of "open space," nor does it argue that the BSA's reading is the most persuasive reading of the statute.  Instead, it asserts that the statute is complicated and therefore we should defer.  That reasoning is anathema to our Court's principles of statutory interpretation and administrative deference.  Finally, the majority is correct that in *Toys "R" Us*, after we determined the meaning of the crucial statutory terms, we deferred to the BSA's factual findings that the property owner in that case had abandoned its prior usage of the building.  That factual question involved a "weighing [of] the evidence," including parsing conflicting witness testimony and reviewing "warehouse logs" to ascertain how the property had been used over the previous two years (*id*. at 422-424).  In contrast, the present appeal involves no disputed facts.

two possible readings of the statute, the choice of standard of review does not matter to the outcome. The BSA's interpretation contravenes the plain language of the statute and therefore fails as a rational interpretation of the Zoning Resolution.[6]

In an effort to locate any support for the BSA's position, the majority offers an array of unpersuasive arguments based for the most part on the notion that because the statute is complex, we should make no effort to understand its meaning, nor must we require the BSA to present reasonable grounds for its interpretation.[7] Other arguments are fundamentally about policy choices concerning changes over time to the nature of building ownership. Some of those reasons might convince a legislative body to rewrite the zoning resolution. But the majority's justifications for deferring to the BSA are flatly contradicted by our precedent and none is persuasive.

First, the majority declares that only the BSA's interpretation gives "salience" to a critical feature of the statute—the fact that the definitions of "dwelling unit" and "rooming unit" in the Zoning Resolution both mention that these living spaces are located "in . . . residential building[s]" (ZR § 12-10). As a guide to understanding the meaning of "open space," I question the importance of the majority's epiphany that apartments exist within residential buildings. But we can interpolate that feature of the Zoning Resolution directly

---

[6] My colleagues and I do not "fancy[]" ourselves to be "land-use expert[s]" (majority op at 14 n 12), though we claim some modest expertise in interpreting statutes, which is all that is at issue here.

[7] We are told that the "definition of open space in ZR § 12-10 comprises no less than 13 defined terms, many of which cross-reference other defined terms" (majority op at 11), but the majority makes no effort to analyze those 13 terms and other cross-references to see whether they matter at all or what interpretation they support.

into the definition of "open space" and the meaning does not change one bit. Open spaces must still be accessible to "all persons occupying a dwelling unit [in residential buildings] . . . on the zoning lot" (*id.*).

Second, the majority states that because the Zoning Resolution employs a "set of cross-references and interlocking provisions," the BSA must be afforded a special level of deference (majority op at 11). The example the majority gives is that the Zoning Resolution defines "dwelling unit" in part by reference to a "residential building" which requires consulting the statute to understand the meaning of "building." That argument is flawed on several levels. Clearly, it is foreclosed by our precedent. We have repeatedly declined to defer to the BSA when interpreting the Zoning Resolution's interlocking set of definitions (*see e.g. Raritan Dev. Corp.*, 91 NY2d at 107; *Toys "R" Us*, 89 NY2d at 419). Unless the majority can explain why the definition of, for example, "floor area ratio" should be interpreted differently than "open space," the majority's theory of administrative deference is contravened by controlling law.

The majority's reasoning is also illogical. It is true that the Zoning Resolution includes terms of art that must be understood in context. That is a feature of all statutes. However, the fact that the Zoning Resolution employs terms that are specifically defined in the statute makes it *easier* for judges to ascertain legislative intent, not harder. Definitions mark a path for jurists to follow.[8] The situation is far harder when judges must

---

[8] For example, the word "adjacent" in the term "adjacent lot" (ZR § 74-79) has evolved over time as the City's policy priorities have shifted, in part to benefit owners of landmarked properties. In an effort to increase the usefulness (and lucrativeness) of transferrable development rights, New York City expanded the definition of "adjacent lots"

interpret statutes that turn on broad and undefined terms, such as the requirement for utilities to charge "just and reasonable" rates (Public Service Law § 65 [1]). It is precisely because the City Planning Commission has defined critical terms such as "open space" and "zoning lot" that we are able to reach clear conclusions as to what the Zoning Resolution requires.

Third, the various provisions the majority cites as sources of ambiguity are irrelevant to the statutory question at hand. Perhaps that is why the BSA itself has not argued that the definition of a "room" or a "residential building" is essential for resolving the present dispute. If we were called upon to decide whether someone who lived in a Winnebago parked on the zoning lot had a legal right to access open space, we might need to delve into the nuance of how the Zoning Resolution defines "dwelling unit" or "room." Here, no party disputes that the residents of the three Park West Village buildings qualify as "persons occupying a dwelling unit or rooming unit on the zoning lot" (ZR § 12-10). The Zoning Resolution is clear that "all" such persons must be able to access open space, and the vast majority of the provisions cited by the majority play no role in the resolution of this lawsuit.

--------

in 1968 to permit owners of landmarked sites to sell unused development rights to non-contiguous (but still proximate) parcels located across streets and intersections (*see* Margaret Giordano, Note, *Over-Stuffing the Envelope: The Problems with Creative Transfer of Development Rights*, 16 Fordham Urb LJ 43, 43 n 4 [1988]). A reader who relied solely on a common dictionary to understand the meaning of "adjacent" would be led astray. Fortunately, the Zoning Resolution defines "adjacent lot" (*see e.g.* ZR § 74-79 [defining adjacent lot for the purpose of transferrable development rights for landmark sites]). Although the majority is correct that the Zoning Resolution employs technical vocabulary, technical does not mean judicially indiscernible.

A statute might come along that is uninterpretable because it is pure gibberish, but here, the statute's words can at most be read in two ways, only one of which is sensible, and neither of which the majority adopts. We should not permit administrative agencies to rewrite statutes or exceed the restrictions placed on them by law (*see Matter of Tze Chun Liao v New York State Banking Dept.*, 74 NY2d 505, 510 [1989] ["Administrative agencies, as creatures of the Legislature within the executive branch, can act only to implement their charter as it is written and as given to them . . . An agency cannot create rules, through its own interstitial declaration, that were not contemplated or authorized by the Legislature and thus, in effect, empower themselves to rewrite or add substantially to the administrative charter itself"] [internal citation omitted]).

Lacking support in the text of the statute, the majority attempts to invoke the legislative history of the Zoning Resolution, an interpretative guide that is unnecessary when the plain text of a statute is clear (*see Matter of Roosevelt Raceway v Monaghan*, 9 NY2d 293, 304-305 [1961]). Even were we to consider the scant legislative history cited by the majority, those materials do not illuminate the present question. The majority notes that a handbook published by the City Planning Commission in 1961 advertised that open space under the new Zoning Resolution would be "accessible to all residents of a building" (majority op at 13). The majority gives no indication that this portion of the handbook was written with multi-building zoning lots in mind, and accordingly, we can divine very little from that stray quote. (Moreover, the quote strongly suggests that the second possible interpretation of the open space requirement is suspect.)

The majority then pivots 180 degrees and argues that the drafters of the 1961 Zoning Resolution did not anticipate the problems arising with multi-owner zoning lots because these lots were not permitted until 1977.  I cannot reconcile the majority's conclusion that the legislative history supports the BSA's reading if, as the majority claims, the drafters of the Zoning Resolution did not envision the situation that has arisen here.  Regardless, this second argument is dubious as a historical matter and irrelevant as a legal one.  As a matter of urban history, the phenomenon of zoning lots with more than one building predates the 1961 zoning resolution.  Although this dispute presents a situation where portions of the zoning lot are owned by different entities, the BSA's interpretation of "open space" rests upon a rationale that is not dependent upon whether a zoning lot has one or more owners.  Instead, the BSA contends that no violation of the open space requirement occurs when, in a multi-building lot, developers divvy up open space into zones of exclusive access building-by-building.  Because multi-building lots predate the 1961 or 1977 amendments to the Zoning Resolution, the situation here was not one beyond the capability of the drafters to envision.

Interesting as the urban history exercise might be in some other context, it is irrelevant as a matter of statutory interpretation.  The majority's view—that new problems have arisen, and therefore the BSA can avoid clear statutory directives—is simply unavailing.  Our Court has made clear that "[t]he courts are not free to legislate and if any unsought consequences result [from the continued application of a statute], the Legislature is best suited to evaluate and resolve them" (*Bender v Jamaica Hosp.*, 40 NY2d 560, 562 [1976]; *see also Ivey v State*, 80 NY2d 474, 480 [1992] ["In essence, the State is asking

the Court to rewrite, not just interpret, the statute. This we may not do"]).  Contrary to the majority's holding today, the BSA is not exempt from the basic requirement to abide by the language of the statute, even if that language creates hurdles for certain forms of development as New York City changes and grows (*Raritan Dev. Corp*, 91 NY2d at 107 ["The solution (to a perceived problem in the Zoning Resolution) is for the City to legislate a different definition if that is its intent, to be manifested by the ordinance itself"]).  If compliance with the Zoning Resolution poses challenges, the proper recourse is to the City Planning Commission, which has proven to be an active steward of the Zoning Resolution. Since 1961, the City Planning Commission has overseen approximately "10,000 amendments . . . to the [zoning] resolution" (New York City Dept. of City Planning, *History Button: DCP's Digital Zoning Resolution Now Includes a Full Legislative History* [June 19, 2019], https://www1.nyc.gov/site/planning/about/press-releases/pr-20190619.page).

Finally, the majority asserts that we must defer to the BSA's understanding of the "feasibility" of complying with the Zoning Resolution.  The responses above are sufficient to refute that point.  The open space requirement has remained static for 60 years.  If changes to the urban landscape have rendered it unworkable, those concerns must be addressed to the City Planning Commission.  Changes to the urban landscape do not themselves change the law and do not excuse BSA from complying with the clear text of the Zoning Resolution.

As a further point, the majority's view of "feasibility" mischaracterizes the purpose of the Zoning Resolution.  The core premise of as-of-right zoning is that all residents of

New York City—developers, neighbors, and city planning officials—benefit from clear rules concerning legal entitlements to develop land. To advance those aims, the Zoning Resolution sets out minimum requirements for as-of-right construction, and then invites developers to design and create within those constraints—or seek variances from them. In the context of an as-of-right zoning system, an objection that complying with the Zoning Resolution renders infeasible certain forms of development is really no objection at all. Every design constraint limits what can be built as of right: that is a basic consequence of any land use regulation. The requirement that open space be accessible to all residents of the lot does not eliminate a property owner's ability to build. Instead, it simply supplies another design constraint that developers and architects must consider.

In this case, the developers of 808 Columbus Ave built a 29-story residential tower with two adjoining commercial wings, one of which includes a high-end grocery store. The developers' decision to make the rooftop gardens atop the grocery store accessible only to residents of the adjoining tower was based on the BSA's erroneous reading of the Zoning Resolution. If instead, the BSA had interpreted the statute correctly, a developer like 808 Columbus Ave, LLC would still have an array of design possibilities for how to utilize the parcel. The developer could: (a) provide key card access to residents of other buildings on the zoning lot (appellant JHL committed to doing just that with the Meditation Garden in its proposed nursing home, representing to the Department of Buildings that it would provide "every resident of the zoning lot . . . [with] a key card to access" the garden), (b) build a 29-story building without an adjoining grocery store, if the addition of the store removed necessary open space, (c) construct a smaller residential tower which needs less

open space and then build only one commercial wing rather than two, (d) subdivide the zoning lot (*see* ZR §§ 12-10, 23-72), or (e) pursue some other possibility entirely. Developers are eminently creative tacticians when it comes to designing within the constraints of the Zoning Resolution, a fact made abundantly evident by the land-swap that PWVA and JHL conducted in order to make use of the fact that a nursing home would require less open space then other residential buildings.

Indeed, the subsequent history here utterly undermines the majority's view that the literal interpretation of the open space requirement is infeasible. After the Appellate Division annulled the BSA's decision, the developer, PWVA, submitted plans for a completely different building that proposed less encroachment on the existing open space on the zoning lot. "Feasibility" cannot turn on this Court's judgment about which building is preferable or, indeed, whether any building is preferable.

New York City has determined that the city benefits from clear design constraints arrived at through a process of political and community input that resolves competing visions for what the city should look like. Those understandings of how the city should grow and develop are codified in the Zoning Resolution. Developers build within those constraints; the BSA resolves disputes, pursuant to its delegated authority; the City Planning Commission updates the Zoning Resolution as needed; and courts serve as final arbiters of the meaning of the Zoning Resolution. That is how the system is supposed to work. Permitting the BSA to rewrite the definition of open space upends that statutory structure.

Order reversed, with costs, judgment of Supreme Court, New York County, reinstated and certified question not answered as unnecessary. Opinion by Judge Feinman. Chief Judge DiFiore and Judges Stein and Garcia concur. Judge Wilson dissents in an opinion in which Judges Rivera and Fahey concur.

Decided December 17, 2020